IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| JACQUELINE SHIPLET,<br><br>    **Plaintiff,**<br><br>vs.<br><br>ANN VENEMAN, SECRETARY<br>THE UNITED STATES<br>DEPARTMENT OF<br>AGRICULTURE,<br><br><br>    **Defendant.** | CV 05-15-BLG-RFC-CSO<br><br><br>FINDINGS AND<br>RECOMMENDATIONS OF<br>UNITED STATES MAGISTRATE<br>JUDGE |

## I.    INTRODUCTION

Plaintiff Jacqueline Shiplet ("Shiplet") filed this action against the Secretary

of the United States Department of Agriculture ("USDA") on January 21, 2005.

Her complaint alleges that employees of Farm Service Agency (FSA), formerly

known as Farmers Home Administration (FmHA), discriminated against her on the

basis of her gender, age and marital status in administering farm programs. *See*

*Final Pretrial Order (Court's Doc. No. 95) at 2.*  She contends that this

discrimination deprived her of equal and fair access to farm credit and farm

programs in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §

1691 et seq.  For relief, she seeks damages, attorneys fees, and FSA debt

forgiveness.  *Id. at 6-7.*

This is an appeal from an administrative ruling denying Shiplet relief.

Although such appeals ordinarily are decided considering only the administrative

record, Shiplet was allowed an opportunity to conduct discovery to supplement the

administrative record with evidence showing disparate treatment. *See Order dated*

*February 15, 2006 (Court's Doc. No. 25)(applying the governing standard of*

*review set forth in the Historical and Statutory Note to 7 U.S.C. § 2279).*

After a period of extended discovery,[1] this Court conducted an evidentiary

hearing on September  25, 26, and 29, 2008.  The purpose of the evidentiary hearing

was to allow the parties to present additional evidence to supplement the

administrative record with respect to Shiplet's claims of disparate treatment.

Based on a review of the administrative record as supplemented by the

evidence presented at the evidentiary hearing, the Court recommends that the

following Findings of Fact and Conclusions of Law be adopted.

## II.    FINDINGS OF FACT

---

[1]Both Shiplet (*see Court's Doc. Nos. 33, 44, 46, 53*) and the USDA (*see Court's Doc. 27, 30, 49)* moved for extensions of discovery scheduling.

## A.   Administrative Procedural History

1.      Shiplet initially filed administrative complaints with the USDA dated October 26, 1996, and December 26, 1996, alleging discrimination on the basis of sex, age, and marital status by FmHA and its successor agency FSA.   (See ALJ Pleadings, Doc. No. 51 at 1)("ALJ Det.").

2.      On May 14, 2001, Shiplet requested a hearing before an administrative law judge (ALJ).  After the USDA Office of Civil Rights filed a required report of investigation on January 28, 2002, a hearing was scheduled for June 2002.  The hearing was continued on multiple occasions due to attempts to clarify the issues for adjudication, and was finally conducted in August 2003, in Bozeman, Montana.

3.      In a 35-page decision dated April 9, 2004, the ALJ determined that Shiplet failed to prove by a preponderance of the evidence that the agency denied her credit benefits or treated her less favorably than other credit applicants on the basis of sex, marital status, or age.  He ordered that her complaints charging the agency with discriminatory conduct be dismissed with prejudice.  (ALJ Det. at 35).

4.       On May 10, 2004, Shiplet requested that the USDA Assistant Secretary of Civil Rights review the ALJ's determination. ( ALJ Pleadings at Doc. No. 52).  In a 14-page decision, the Assistant Secretary affirmed dismissal of the Shiplet's complaint, on July 29, 2004. *See Third Supplement to Administrative Record, Court's Doc. No.  117-2.*

3

5.      Shiplet then initiated this action under P.L. 105-277, Div. A [Title VII, § 741] (codified under the Historical Notes to 7 U.S.C. § 2279).  That section provides for judicial review of a USDA determination concerning allegations of discrimination and contains a waiver of otherwise applicable statutes of limitation.

**B.    USDA Farm Loan Programs**

6.      The USDA has two broad categories of farm loan programs which are currently administered by FSA.  The agency has a direct loan program, in which a borrower applies directly to the agency for financing.  If approved, the loan funds are provided directly by the agency to the borrower.  (Tr. 319).[2]  In this situation, the debtor-creditor relationship is between FSA and the borrower, and FSA administers and services the loan.  (Tr. 481).

7.      The agency also has a guaranteed loan program.  Under this program, a commercial lender applies to FSA for a guarantee on a loan to an agricultural borrower.  (Tr. 492).  If approved, FSA guarantees that it will reimburse the commercial lender for a percentage of any loss the lender may sustain on the loan.

_____

[2]  The following abbreviations are used in citing to the record in this opinion:

| | |
|---|---|
| Administrative Hearing Transcript | ALJ Tr. __ |
| Complainant's Administrative Exhibits | Cx. |
| Government's Administrative Exhibits | Gx. |
| Federal Court Transcript | Tr. __ |
| Federal Court Exhibits | Ex. |

4

(Tr. 493).  In this situation, the commercial lender, not FSA, provides the financing to the borrower, and the debtor-creditor relationship is between the commercial lender and the borrower.  (Tr. 492).  The commercial lender also administers the loan, and provides loan servicing.  (Tr. 482).

8.     These loan programs included farm ownership loans (designed to allow the applicant to acquire property), operating loans (to pay ongoing expenses of farming) and emergency loans, as well as others.  (Tr. 43).

9.     Because FSA provides taxpayer-subsidized loans, it is not authorized to compete with commercial lenders.  (Tr. 485).  To obtain credit from FSA, the borrower must be unable to obtain credit from any other source and must demonstrate economic feasibility.  (ALJ Tr. 3 at 265; Tr. at 43, 45-46).  Economic feasibility meant that an applicant had to demonstrate that the relevant farm and home plan "cash flowed", that is, that money was left to service the debt after all expenses were deducted from all income.  (Tr. at 46).

### C.     Shiplet Land Purchases

10.     On July 25, 1980, Shiplet and her husband, Robert Shiplet, Sr., (collectively referred to as the Shiplets), purchase a tract of land on contract from the Shields River Bench, a partnership consisting of Ronald L. Burgess, John L.

Lake, Jr., and Nick Mallas.  The purchase price was $110,000, with a down-payment of $21,500, and annual payments of $12,017.  (ALJ Findings of Fact (FOF) # 4; ALJ Tr. 1, pp. 16-19; Burgess v. Shiplet, 230 Mont. 387, 388, 750 P. 2d 460, 461 (1988)).  Shiplet testified that she and her husband knew "it was out of our range" but claimed that someone advised them to do it.  (ALJ Tr. 1 at 19, ll. 6-7).

11.     On February 2, 1981, the Shiplets submitted a certified statement of financial condition to First Security Bank of Livingston, listing their assets and liabilities as of that date.  The financial statement stated that the Shiplets had total assets valued at $1,234,875, including 7,358 acres of land worth $1,000,000, and total liabilities of $619,098.70.  The financial statement did not list the liability that the Shiplets had incurred as a result of buying land from the Shields River Bench on July 25, 1980.  The liability created by that transaction had not been extinguished as of February 2, 1981.  (ALJ FOF # 5, Cx. 3, p. 1; Burgess, 230 Mont. at 388, 750 P.2d at 461).

12.     On July 28, 1981, the Shiplets and their daughter purchased another tract of land on contract from the Shields River Bench.  The purchase price was $110,000, with a down-payment of $10,000, and annual payments of $13,575. (ALJ FOF # 6; Burgess, 230 Mont. at 388, 750 P.2d at 461).

13.     The Shiplets later defaulted on both of the foregoing land purchase obligations and the vendors sued.  When the case came before the Montana Supreme Court in 1988, the Court ruled in favor of the vendors on all issues and observed:  "Respondents [the Shiplets] lived on the property, farmed the land and kept all income from it since 1980 on one parcel and since 1981 on the other.  They have continued to possess, enjoy and reap the benefits from the property without making any payments on it since June 1983 on the first contract, and May 1984 on the second contract."  (ALJ FOF # 7; Burgess v. Shiplet, 230 Mont. at 391,750 P.2d at 462).

14.     Numerous documents submitted by the Shiplets to FmHA, including financial statements, loan applications and farm and home plans, failed to disclose the purchase of these additional properties, totaling $220,000, down payments totaling approximately $36,000, and requiring annual payments of more than $26,000.  (ALJ Tr. 2,  pp. 39-41, 43-45, 50-58).

### D.     Shiplet's Loans

#### 1.     1974 Guaranteed Emergency Livestock Loan

15.     In September 1974, First Security Bank of Livingston applied to the FmHA office in Bozeman for a guarantee on a prospective loan to the Shiplets. (

Ex. 101, 102; ALJ Tr.1at 15, l. 9).  FmHA approved the application and issued a

contract of guarantee for $239,500 on January 3, 1975.  (Ex. 104).  Pursuant to

requests by both the bank and the Shiplets, FmHA regularly renewed and increased

the amount of, the guarantee on the loan over the next ten years.  (Ex. 105-115; Gx.

1, pp. 28, 39, 46, & 47).

16.     The terms of this loan permitted First Security to charge a variable

interest rate based on changes in the prime lending rate.  The interest rate that the

bank charged the Shiplets rose to a high of 20.5 % in l981 and then declined over

subsequent years to 16.5 % in l985.  (ALJ Tr. 3 at 388).

### 2.     1981 Direct Loan Application

17.     On or about September 14, 1981, Shiplet advised FmHA that the bank

was requiring the Shiplets to pay off their guaranteed loan, and the Shiplets jointly

applied for a direct loan from FmHA for that purpose.  (ALJ Tr. 1 at 26; Cx. 4).  On

the Shiplets' application, their off-farm income included a projected $20,715 from

Shiplet's employment as a teacher for the Livingston Public Schools, and a

projected $16,346 from Robert Shiplet's employment as a heavy equipment

operator for Wickens Construction in Springdale.  (Cx. 4 at 1).  Robert Shiplet

signed the application as the applicant, and Shiplet signed the application as the

applicant's spouse.  (Cx. 4 at 2).

8

18.    FmHA County Supervisor Richard Parker (Parker) determined that First Security Bank was not requiring that the guaranteed loan be paid.  The bank was willing to again extend the loan, as it had regularly done in the past.  Parker contacted the Shiplets on January 15, 1982, and advised them of that fact.  (ALJ Tr. 2 at 224-225).  He also contacted the bank, and advised that FmHA was willing to extend the guarantee on the loan.  (Id.).

19.    The September 1981 application to FmHA was not acted on further by either FmHA or the Shiplets after the guarantee was extended.  A borrower is not eligible for direct loan assistance from USDA if the borrower qualifies for a commercial loan, with or without a FmHA guarantee.  (Tr. at 570, 580; ALJ Tr. 2 at 226-227).  Shiplet was aware of this restriction.  (ALJ Tr. 2 at 61, ll. 10-11).

### 3.    1984 Loans

#### a.    Direct Economic Emergency Loan (EE) Application

20.    On January 23, 1984, the Shiplets submitted an application dated December 7, 1983 for a direct EE loan.  As with their 1981 application, the stated purpose for the loan was "we have to pay off our guaranteed livestock loan."  (Cx. 8).  Robert Shiplet signed the application as the applicant, and Shiplet signed as the applicant's spouse.  The Shiplets were advised that the agency did not know if it would have funds to loan.  (Gx. 1, p. 57)

9

21.     From February 3, 1984 through February 14, 1984, First Security

Bank, FmHA, the Shiplets, and their attorney, Terry Schaplow, held discussions

and meetings concerning the EE guarantee program.  (Gx. 1, pp. 57, 64, and 65).

22.     The Shiplets then came to the FmHA office in Bozeman on February

27, 1984 to submit an application for a guarantee on a new EE loan from First

Security Bank of Livingston in the amount of $400,000.  (Gx. 1, 65, 69-75).  The

proposed guaranteed loan included a payoff of the Shiplets' existing guaranteed

loan with the bank in the amount of $337,818.30, an additional $36,000.00 for

operating, and land payments totaling $59,493.00.  (Gx. 1, p. 69; ALJ Tr. 2, pp.

252-258).

23.     After the bank submitted additional information to support the

application, on April 2, 1984, FmHA approved the guarantee, and issued a

conditional commitment for a contract of guarantee on May 9, 1984.  (Gx. 1, pp. 94,

137-138, and 139).  Attached to the conditional commitment was a list of 11

conditions that the Shiplets were required to meet, including a requirement that they

sell sufficient land to reduce their debts by approximately $338,000.  (Gx. 1, pp.

137-40; ALJ Tr. 3, pp. 29-32).  The Shiplets did not sell land to reduce their debts.

(ALJ Tr. 3, p. 34-35).

24.     Nonetheless, the bank closed the loan on July 30, 1984.  (Ex. 126)  The interest rate on the note was to be variable based on the bank's base rate, plus 1%.  (Gx. 1, p. 140).  When the loan was closed, the rate on the note was 15.65%.  (Ex. 126; Gx. 1, p. 139).  Shiplet's expert witness Patrick O'Brien testified that the standard variable rate in 1983 and 1984 was 22%.  (ALJ Tr. 2, p. 152).  He also reported that the standard commercial rate was 16.5% in 1983.  (Tr. 333).

25.     The loan application dated December 7, 1983, and submitted on January 23, 1984, was never completed.  (ALJ Tr. 3, pp. 191-192, 218-219).  Neither FmHA nor the Shiplets took any further action on the January 23, 1984, application because the stated purpose for the loan was satisfied by the new guaranteed loan from First Security.  (ALJ Tr. 2, pp. 257-258; Tr. 580-581).

### b.     EM Loan Application

26.     On November 26, 1984, the Shiplets filed an application with FmHA for a crop disaster emergency (EM) direct loan.  (Cx. 19; Gx. 1, pp. 171-172; ALJ Tr. 3, p. 36).  The application was signed by Robert Shiplet as the applicant, and Shiplet as the applicant's spouse.

27.     The application was incomplete when submitted, and required additional information to be submitted by the Shiplets.  (ALJ Tr. 3, p. 71).

28.    To calculate crop losses for purposes of an EM loan, the agency was required to use proven crop yields, based on a five year history.  (Tr. 755).  In the absence of verifiable yields from the applicant, the agency either used data supplied by another agency (the Agricultural Stabilization and Conservation Service (ASCS)) relative to the applicant's production history, or established county averages.  (ALJ Tr. 3, pp. 63-66; Gx. 1, pp. 191-192).

29.    The Shiplets did not provide the actual production records to calculate their crop losses.  (ALJ Tr. 3, pp. 63-68).  Consequently, the agency obtained production data from ASCS to complete their actual loss calculations.  (ALJ Tr. 3, pp. 63-68).  This increased the time required to complete the EM loan application, because it required FmHA to wait for another agency to provide the necessary information.  (ALJ Tr. 3, p. 67).

30.    After receiving the necessary crop yield data, FmHA calculated the Shiplets' crop losses on April 19, 1985.  (ALJ Tr. 3, pp. 59-66; Gx. 1, pp. 191-192).  Parker also met with the Shiplets on April 19, 1985, and assisted them in completing their application, and in the preparation of a farm and home plan required for the application.  (ALJ Tr. 3, p. 71).  The Shiplets' 1984 EM loan application was then certified as eligible by FmHA's County Committee at its next meeting on May 14, 1985.  (ALJ Tr. 3, pp. 71-72; Gx. 1, p. 193).  The county

12

supervisor approved the loan on June 21, 1985.  (ALJ Tr. 3, pp. 75-76; Gx. 1, pp. 197-98).

31.    Upon completion of the necessary property appraisal and title examination, the loan was closed on July 24, 1985, by a private attorney selected by FmHA, and the loan proceeds of $39,160 were disbursed by that attorney pursuant to the Shiplets' instructions.  (ALJ Tr. 3, pp. 77-78; Gx. 1, pp. 230-31).  None of the proceeds of the EM loan went directly to the Shiplets.  (Gx. 1, p. 231).  The proceeds were primarily applied to decrease the Shiplets' debt to First Security Bank.  (Gx. 1, p. 231).

**4.    1985 EM Loan Application**

32.    On September 16, 1985, the Shiplets submitted a second application for a crop disaster emergency direct loan (EM) to FmHA.  (ALJ Tr. 3, pp. 79-80; Gx. 1, pp. 250-251).  Robert Shiplet signed the application as the applicant, and Shiplet signed the application as the applicant's spouse.  (Gx. 1, p. 251).

33.    On November 4, 1985, FmHA returned the application to the Shiplets by mail because it was incomplete, and the agency had been unable to contact them by telephone.  (ALJ Tr. 3, pp. 83; Gx. 1, p. 263).  Also, the application could not be processed further because it was not accompanied by the necessary farm and home plan.  (Tr. 3, pp. 85-86).

13

34.     At the time the Shiplets submitted their 1985 EM loan application, the Bozeman FmHA office had received an unprecedented number of similar loan applications, and was required to hire independent contractors to help process the applications.  (ALJ Tr. 3, p. 81).  In fact, in a survey of a sampling of FmHA files, there were approximately thirty-five loan applications submitted in 1985, the bulk of which were EM applications, compared to just eight in 1983.  (Ex. 88, pp. 2-4).  On January 11, 1986, one of the contractors hired by FmHA, Dean Davidson, visited the Shiplets at their ranch to assist in the completion of the required farm and home plan.  (Gx. 1, p. 277; ALJ Tr. 3, 88-91).  Davidson was the former chief of farmer programs for the agency's state office.  (ALJ Tr. 3, p. 87).

35.     The Shiplets advised Davidson of their pending lawsuit with First Security Bank.  They advised Davidson that they anticipated a settlement very soon, which they believed would be quite favorable, would "wipe out" their debt to the bank, and put them in a much better condition to continue the ranching operation. (Gx. 1, p. 277)

36.     In his analysis, Davidson  found that the soundness of the Shiplets' ranching operation for 1986 and future years would, to a large extent, be dependent on receiving a favorable settlement with First Security Bank of Livingston.  (Gx. 1,

14

p. 299).  He therefore recommended that any loan to the Shiplets not be closed until their lawsuit with the bank had been satisfactorily resolved.  (Gx. 1, p. 300).

37.     When the county supervisor reviewed the Shiplets' application with the state office, he determined that the application did not meet the EM lending requirements.  (Gx. 1, p. 308).  A letter informing the Shiplets of that decision was sent to them on April 22, 1986.  (Gx. 1, p. 310).

38.     Following receipt of the letter, the Shiplets went to the county office on April 28, 1986, and met with the county supervisor to discuss the denial of their loan request.  (ALJ Tr. 3, pp. 106-108).  Following the meeting, the FmHA county supervisor reconsidered the denial and continued to process the loan.  He received revised information relative to the Shiplets' equity in their real estate on or about June 19, 1986, which determined the maximum amount of financing available. (Gx. 1, p. 308-309).  He then received additional information pertaining to pay off amounts on another mortgage on the property on July 2, 1986.  (Gx. 1, p. 309). Thereafter, the county supervisor officially notified the Shiplets on July 15, 1986 that their loan had been approved in the amount of $40,220.  (Cx. 28).  Closing on the loan was expressly conditioned upon the Shiplets' litigation with First Security Bank being satisfactorily resolved.  (Cx. 29).

39.     Although the Shiplets' suit against First Security was not resolved until 1988, the agency continued to process the loan.  When the loan documents were transmitted to a private attorney chosen by the agency to close the loan, the Shiplets contacted the agency on July 23, 1986 and objected, because the attorney's firm was representing the bank in the Shiplets' lawsuit against the bank.  (Gx. 1, p. 309). The Shiplets requested that a member of their attorney's firm, Lyman H. Bennett, close their loan.[3]

40.     On July 24, 1986, U.S. Treasury check no. 47,247,85, for a loan in the amount of $40,220 was issued and made payable to Robert and Jacqueline Shiplet. (Gx. 3, p. 23).

41.     On August 1, 1986, Bennett ordered a preliminary title commitment from American Land Title Company for the property to be taken as security for the loan.  (Gx. 3, p. 12).  On August 11, 1986, a commitment of title insurance was issued by Park County Title covering the Shiplets' property which was to be mortgaged to FmHA as security for the EM loan.  (Gx. 3, pp. 14-22).

42.  Bennett closed the loan September 8, 1986.   (ALJ Tr. 2, p.180, Gx. 3, pp. 79-80).  At that time, Bennett informed FmHA that he had closed the loan, and

_____

[3]  The Shiplets were represented in their lawsuit against the bank by Terry Schaplow, then an associate in Mr. Bennett's firm.

16

filed the papers of record, but had not disbursed the loan proceeds because consent and agreement forms had not been provided by the Shiplets for third-party holders of interest in the real property that formed the security for the loan.  (ALJ Tr. 3, p. 13; Gx. 3, pp. 92-118).

43.     Although the Shiplets and Schaplow were unable in the ensuring months to obtain two of the necessary consent and agreement forms, FmHA authorized disbursal of the funds.  Disbursal occurred on December 31, 1986.  (ALJ Tr. 2, pp. 181-83; ALJ Tr. 3, pp. 13-14; Gx. 3, pp. 105-10, 116-17).  The Shiplet's counsel, Terry Schaplow, signed the disbursement checks.  (Gx. 3, pp. 119-121, 124, 125-127, 129; ALJ Tr. 2, 180).   The EM loan proceeds were not intended to be used by the Shiplets for annual operating or living expenses, but instead were to be applied to decrease the Shiplet's indebtedness to creditors.   (Gx. 1, pp. 277, 281, 309).

### 5.     1994 Direct Loan Application

44.     On August 22, 1994, approximately one month after the Shiplets received their discharge in bankruptcy, they filed a loan application with FmHA dated August 14, 1994.  The application requested loans totaling $400,000 from the government, and was incomplete when submitted.  (Cx. 43).

45.     Parker notified the Shiplets on August 23, 1994, and September 28, 1994, that they needed to supply additional information to complete their 1994 loan application.  (ALJ Tr. 3, pp. 116-119; Gx. 1, p. 1402).

46.     Parker retired from FmHA on November 4, 1994.  Shortly thereafter, Vern Tesch (Tesch) became the acting county supervisor for FmHA in Bozeman. (Tr. 3, pp. 119, 148).

47.     On November 18, 2004, the agency received a letter from the Shiplets, requesting a disaster set aside for their 1995 payments on their FmHA loans.  (Ex. 142).  The request was approved by the agency.  (Ex 142a).

48.     Tesch met with the Shiplets on December 1, 1994, and requested that the Shiplets provide him with their actual production records, i.e calf weights and calving percentages, copies of crop leases, and pasture cattle agreements.  (Gx1, p. 1497; ALJ Tr. 3, pp. 156, 159).

49.     In all instances of crop and livestock production, FmHA used the state and county averages because the Shiplets did not provide records indicating that their actual production was above the state averages. (Tr. 500-05).

50.     On January 6, 1995, Tesch also called the Shiplet's attorney, Terry Schaplow, to request updated financial information.  (Gx 1, p. 1509; ALJ Tr. 3, p.

164).  Schaplow did not provide an updated financial statement.  ( ALJ Tr. 3, p.

164).

51.    Tesch analyzed the Shiplets' loan application with the information

available, and concluded that the Shiplets' ranching operation had lost an average of

$29,608 each year for the previous five years while under bankruptcy protection.

Tesch concluded that the Shiplets would be unable to pay expenses and service their

debts if the requested loans were made.  At the time Tesch made this determination,

the Shiplets still had not complied with the agency's request to supply an updated

financial statement.  (ALJ Tr. 3, pp. 156-160, 164, 167, 170; Gx. 1, pp. 1498-99).

52.    Since Tesch did not have authority to rule on loan requests as large as

$400,000, the application was forwarded to Roger Meredith (Meredith), the

agency's credit director for Montana, who had authority to determine loan requests

of that magnitude.  (ALJ Tr. 3, pp. 167-68, 274).

53.    After the 1994 loan application was completed on January 5, 1995,

Meredith informed the Shiplets by letter dated January 24, 1995, that their

application had been denied.  Meredith concluded (1) that the Shiplets could not

reasonably be expected to have sufficient cash flow to service the debt, even at the

agency's lowest "limited resource" rate, and (2) their credit needs exceeded the

agency's statutory lending limits of $200,000 for farm ownership (FO) loans and

$200,000 for operating (OL) loans.  (Cx. 50; Gx. 4, p. 17).

54.    On February 21, 1995, Meredith met with the Shiplets and their

attorney, Terry Schaplow, at the Shiplets' home to discuss his decision to deny their

1994 loan application.  The Shiplets thereafter submitted additional information that

Meredith incorporated into his analysis of the application.  However, the additional

information did not alter Meredith's conclusion that the requested loans were not

feasible, and that the Shiplets were therefore financially unqualified for the loans

they sought.  He confirmed his conclusion in a letter to Schaplow dated March 10,

1995.  (Cx. 57; Gx. 1, pp. 1576-84).

55.    Meredith used the limited resource interest rate of 5% in his feasibility

calculations.  (Gx 1, pp. 1580, 1584; ALJ Tr. 3, p. 307).

56.    The Shiplets appealed Meredith's denial of their 1994 loan application,

and a hearing was held on April 25, 1995, before a hearing officer of the National

Appeals Division of USDA ("NAD"), Byron Bennes.  After the conclusion of the

hearing, Bennes kept the record open so that the Shiplets could submit additional

information, which they believed would show financial feasibility of their loan

request.  The Shiplets submitted a new farm and home plan based on information

submitted at the appeal hearing.  That plan showed a balance available of $35,947

and annual debt payments of $98,889.  (Gx. 1, p. 1812).  That is, it showed a

projected shortfall of $62,942, almost twice as much as projected by Meredith's

analysis.

57.    After considering the record with the additional information submitted

by the Shiplets after the hearing, Bennes affirmed Meredith's decision on June 2,

1995.  (Gx. 1, pp. 1807-13).

58.    The Shiplets appealed the decision of the NAD hearing officer to the

director of NAD.  On August 14, 1995, the director of NAD affirmed the hearing

officer's decision.  (Gx. 1, pp. 1823-24).

### <u>6.</u>     <u>1995 Direct Loan Application</u>

59.    Two weeks after the director of NAD affirmed Meredith's denial of the

Shiplets' 1994 loan application, the Shiplets prepared another application dated

August 28, 1995, which they filed with the agency on September 5, 1995.  (Gx. 1,

p. 1833).  In that application, the Shiplets again requested FO and OL direct loans

totaling $400,000.  (Gx. 1, p. 1834).  After the application was completed on

October 10, 1995, Meredith analyzed it, and concluded that the requested loans

were not feasible.  The application showed that the Shiplets' financial condition had

deteriorated from the previous year.  He denied the application in a letter to the

21

Shiplets dated November 13, 1995, which gave the Shiplets 15 days in which to
request a meeting to discuss the decision.  (Gx. 1, pp. 1979-81).

60.    On December 6, 1995, 23 days after Meredith's letter of November 13,
1995, the Shiplets came to the FmHA office and requested a meeting.  (ALJ Tr. 3,
p. 319).  Despite the fact that the request was not timely, Meredith agreed to the
meet with the Shiplets to discuss denial of their application.  (ALJ Tr. 3, p. 319).
Following a series of proposed, scheduled, cancelled, and aborted meetings,
Meredith wrote a letter to the Shiplets attorney, Terry Schaplow, on January 18,
1996.  Meredith advised Schaplow if a meeting could not be arranged on or before
February 12, 1996, Meredith would render a decision based on the information he
had on hand.  (Gx 1, p. 2022).  Meredith ultimately issued a decision on February
23, 1996, confirming his earlier decision that the Shiplets' loan application was not
feasible because (1) the Shiplets' operation could not generate adequate income to
service the debt; (2) the statutory lending limits were not sufficient to meet their
total financial needs; and (3) the Shiplets had failed to furnish accurate and essential
information which was requested on numerous occasions.  (Gx. 1, pp. 1989, 2025-
27).

61.    In addition, in a letter dated April 8, 1996, Meredith further advised the
Shiplets and their attorney, Terry Schaplow, that legislation effective April 4, 1996,

precluded the agency from approving the Shiplets' 1995 application for direct FO

and OL loans.  (The Federal Agriculture Improvement and Reform Act of 1996,

Public Law 104-127 ("FAIR Act")).  The FAIR Act prohibited the agency from

approving farm ownership or operating loan applications for the benefit of any

applicant who had a farm loan debt forgiven or reduced through any form of debt

settlement, bankruptcy, or guaranteed loan loss claim.  Since the Shiplets had

received debt forgiveness through bankruptcy on both direct EM loans and a

guaranteed loan from First Security, they were no longer eligible for farm

ownership or operating loan assistance from FmHA.  Further, the legislation

forbade the use of direct FO and OL loans to refinance debt, which was the stated

purpose of the Shiplets' 1995 application.  Meredith also informed the Shiplets that

his determination in this regard was not appealable.  (Gx. 1, pp. 2102-03).

62.     The Shiplets nevertheless appealed Meredith's determination of April

8, 1996 to NAD.  On May 17, 1996, NAD reversed Meredith's ruling that his

determination of April 8, 1996 was not appealable, and ordered that the case be

assigned to a hearing officer.  (Gx. 1, pp. 2160-62).

63.     A hearing was held on August 27, 1996.  On September 26, 1996, the

hearing officer affirmed Meredith's determination.  (Gx. 1, pp. 2310-12).

64.     The Shiplets then appealed the hearing officer's determination to the director of NAD.  On December 10, 1996, the director of NAD vacated both the NAD ruling of May 17, 1996, allowing the Shiplets to appeal Meredith's determination of April 8, 1996, and the hearing officer's affirmation of Meredith's determination.  (Gx. 1, pp. 2320-22).  Consequently, Meredith's letter of April 8, 1996, stands as the agency's final determination regarding the Shiplets' 1995 loan application.

### E.     Other Shiplet Litigation

### 1.     Burgess v. Shiplet

65.     The Shiplets defaulted on both land purchase contracts between themselves and Shields River Bench.  Burgess v. Shiplet, 230 Mont. 387, 389, 750 P.2d 460, 461 (1988).  The Montana Supreme Court found the Shiplets had defaulted on their contracts, awarded attorney fees to Shields River Bench, and remanded for assessment of damages for the Shiplets' breach.  Id. at 391-92, 750 P.2d at 462-63.

### 2.     Shiplet v. First Security Bank

66.     In October 1985 the Shiplets sued First Security Bank based on their guaranteed loan.  They alleged breach of contract, breach of third-party beneficiary contract, bad faith, fraud, negligent infliction of emotional distress, breach of

24

fiduciary duty, and economic duress.  Three years later, the Montana Supreme

Court affirmed the trial court's summary judgment for the bank on all 13 counts of

the Shiplets' complaint.  <u>Shiplet v. First Security Bank of Livingston, Inc.</u>, 234

Mont. 166, 177, 762 P.2d 242, 249 (1988).

### 3.   Shiplet Bankruptcy

67.   The Shiplets filed for bankruptcy on June 9, 1988.  (ALJ Tr. 1, pp. 50-

51; ALJ Tr. 3, pp. 383-84; Cx. 34).  They received a discharge in bankruptcy six

years later on July 14, 1994.  (Gx. 4, p. 17).  As a result of the bankruptcy, the

Shiplets were relieved of their obligations to repay First Security $246,870.68 due

on their guaranteed loan they received in 1984, as well as $29,907.14 due on their

direct EM loans with FmHA.  The government ultimately paid the bank's claim on

the guaranteed loan.  (Gx. 4, p. 17)

### F.   Other USDA Borrowers

68.   In denying the  loan applications in 1981, 1984, 1994, and 1995,

Shiplet alleges that she was treated less favorably by FmHA than other male

applicants.  In support of this contention, Shiplet's expert witness O'Brien selected

five FmHA borrowers for comparison purposes whom he considers generally to be

"similarly situated" to Shiplet.  The borrowers in this category are Cheri and

Wallace Bailey (Baileys), Patsy and Gene Bryan (Bryans), Albert and Martin

Collins (Collins), Joan and Randall Kamps (Kamps), and Matthew Levers (Levers). (Collectively "principal selected borrowers.")  He also selected fourteen other borrowers who he believes are similarly situated for specific purposes.  (Ex. 403). (Collectively "selected borrowers.")  Almost all of the borrowers in this category are either husband and wife family units, or closely held family corporations with a female principal.  (Tr. 352-353).

69.    O'Brien constructed a number of tables to illustrate that the values used on some of the selected borrowers' farm home plans were more favorable, from a cash flow perspective, than the values used on the Shiplets' farm and home plans.  Testimony and exhibits were also received into evidence to show whether the principal selected borrowers were able to meet the projections used on their farm and home plans.  O'Brien also offered testimony that the principal selected borrowers were provided loans in years in which they did not cash flow, contrary to FmHA regulation.

70.    Cash flow evidence is relevant only to the Shiplets' application in 1994.  Prior to that time, the Shiplets were never denied financing on the basis that their farm and home plans did not cash flow.  (Tr. 345-346).  They were not provided financing on their 1981 and 1984 applications because they qualified for commercial credit and were not eligible for direct loans for the same purpose.  (Tr.

26

570, 575).  Cash flow did not become an issue until the denial of their 1994 and 1995 applications.  Cash flow ultimately is moot as to the 1995 application also, because FmHA was statutorily prohibited from giving the Shiplets the loans they applied for because of their previous bankruptcy.

71.    To illustrate the values used by the selected borrowers on their farm and home plans, as opposed to those used by the Shiplets, O'Brien constructed several tables to show comparisons of the values used for real estate, crop production, livestock production, and family living expenses.

## 1.    Real Estate Values

72.    O'Brien calculated the average land values used by the five principal borrowers in Exhibit 445, and compared them to the values used by the Shiplets in Exhibit 452.  The Court finds the issue of the Shiplets' land values to be of minimal relevance.  The Shiplets were never denied financing based on the value of their real estate.  (Tr. 403, 499).  The values have no relevance to the cash flow analysis. (Tr. 617).

73.    Real estate values are only relevant if the borrower is deemed eligible, the loan is determined to be feasible, and the land is to be used as collateral for the loan.  (Tr. 499-500, 617-618).  In that event, actual appraisals were required by FmHA to place a value on the real estate.  (Tr. 499-500, 617-618).  In situations

27

where the agency is not using the real estate as collateral, it relies on the borrower to place a value on their property. (Tr. 500). For the Shiplets' 1994 and 1995 applications, the real estate values were provided by the Shiplets themselves. (Tr. 498; Gx. 1, pgs. 1366, 1434, 1835 and 1907).

74.    The Court also finds the evidence as to average value of the real estate for the principal selected borrowers in Exhibits 445 and 452 of limited relevance because of the inclusion of farm and ranch properties dissimilar to the Shiplets' real estate. For example, three of the five principal selected borrowers - the Bryans, Kamps, and Collins - owned tracts in Gallatin County, where real estate values were, and are, higher than in Park County where Shiplet resides. (Tr. 132). Irrigated tracts are also included, which are substantially more valuable than dryland tracts, such as the Shiplets'. For example, the Bryans owned a relatively small tract of 530 acres of irrigated cropland, just outside of Bozeman near Four Corners. The property was also suitable for subdivision, and had an appraised value of $1,890 per ace. (Tr. 674, 376-378; Ex. 57, p. 243).

75.    Because of the inclusion of farms and ranches in Gallatin County, as well as irrigated units, the Court finds that a disparity in real estate values is to be expected between the average of the principle selected borrowers and the Shiplets.

## 2.    Crop Production

76.    Shiplet also introduced a table to illustrate the disparity in the wheat and barley production values used on selected borrowers plans, compared to those used on the Shiplets plans.  (Ex. 454).  The exhibit does not identify who is included in the "similarly situated" borrowers for this comparison, but O'Brien testified it included the five principal selected borrowers.  (Tr. 414-415).  As a consequence, the average is again distorted by including producers who are not similarly situated to the Shiplets.  Again, three of the principal selected borrowers farmed in Gallatin County.  In their testimony, O'Brien and Baquet agreed that the crop production in Gallatin County is substantially higher than in Park County.  (Tr. 64, 415-416, 549-550).  Baquet characterized the two counties as "two very different places."  (Tr. 549).   Therefore, the Court finds that disparities between borrowers farming in Gallatin County and Park County are to be expected.

77.    In addition, Exhibit 454 includes multiple plans for years 1994 and 1995, some of which are undated, without identifying which plan may have been used by FmHA in its feasibility analysis.  (Ex. 454).  Some of those plans have the

Shiplets' production values higher than the selected borrowers, while other plans for the same year have their production values lower.[4]  (See Ex. 454, plan for 9/12/95)

78.    Meredith testified that FmHA used the state and county averages for wheat and barley production as published in the state regulation price list for farm and home planning.  (Tr. 500).   Importantly, the Shiplets did not provide any historical data to show that their actual production was above the state averages used.  (Tr. 500-501).  O'Brien acknowledged that the Shiplets' actual production for 1994 and 1995 was "well below" the projections used on their farm and home plans.  (Tr. 431-433).

### 3.    Livestock Production

79.    Shiplet also introduced O'Brien's exhibits and testimony to illustrate the disparity between the livestock production values used on the Shiplets farm and home plan and those used by certain selected borrowers.  O'Brien compares cow-calf ratios (Ex. 447, 456), projected receipts per foundation cow (Ex. 448, 457), and cull cow receipts (Ex. 449, 458).

---

[4]  O'Brien testified that he assumed that the undated plans had been used, since they were filed on top of, and thus after, the other plans in the files.  (Tr. 66-67).  His assumption may not be valid, however, since the selected documents were first photocopied by the agency, before being provided to Shiplet in discovery through the U.S. Attorney's office.  (Tr. 566-567).  No testimony was offered as to whether they were ultimately received by O'Brien in the same order as they were originally filed.

80.   The Court notes that the Shiplet's tables use a different group of selected borrowers for different tables to maximize the disparity between the selected borrowers and the Shiplets.  In other words, some tables use just the five principal selected borrowers, while others use those borrowers plus others.  (See Ex. 445 and 448, compared to Ex. 446, 447, 449, 450, and 451).   The Court also notes that O'Brien only uses a small percentage of the selected borrowers for comparison purposes in certain years.  For example, for the years relevant to this analysis, 1994 and 1995, O'Brien only uses two borrowers to arrive at an average for receipts per foundation cow (Ex. 448), and for cull cows (Ex. 449).

81.   The Shiplet's comparison charts for livestock production again include multiple plans for several years, without identifying which of the plans were actually used by the agency for the Shiplets' cash flow determination.  (Ex. 456, Ex. 457, Ex. 458).  In addition, the exhibits include plans submitted after 1996, which are outside the scope of this case.  (Ex. 456, Ex. 457, Ex. 458).

82.   With respect to cow-calf ratios, O'Brien acknowledged that there are many legitimate reasons why one producer may have a higher cow-calf ratio than another producer, including the quality of the foundation herd; the condition of the cow at the end of winter, and whether it has been properly fed; the facilities available

to the producer, including the use of calving barns; and the management practices of the producer in monitoring the herd during calving season.  (Tr. 418-419).

83.    It appears that a 90% calf-cow ratio was used for the Shiplets in 1994, and 88% in 1995.  (Ex. 456).  Meredith testified that he used the state averages for those years, and that the Shiplets did not provide any historical production data that showed their actual production exceeded the state averages.  (Tr. 505).  Meredith explained that during this time the agency was required to use state and county averages, unless the producer could provide historical data which showed their production exceeded those averages.  (Tr. 502).  The Shiplets did not present any evidence to the agency, to the ALJ, or to this Court to establish that the Shiplets' actual production exceeded that ratio.

84.    Receipts per foundation cow are simply a product of the cow-calf ratio, the projected weight of the calves at market, and the projected price per pound.  (Tr. 419-420).  While the cow-calf ratio and the projected price per pound are established by state and county averages, there are variations in the weight of calves at market. This may be due, in part, to the variation in the weight of different breeds of cattle. A Hereford calf, for example, is significantly larger than an Angus calf.  (Tr. 419-420).  Also, the timing of calving impacts the weight of calves.  Producers in lower

elevations and river valleys are able to calve earlier in the year, and will have larger calves at market.  (Tr. 420).

85.  In the Shiplets' case, the state and county averages were used to establish their projected receipts per foundation cow.  (Tr. 505).  Shiplet did not present any evidence to the agency, to the ALJ, or to this Court to establish that their receipts exceeded that projection.

86.   The final livestock production value used for comparison was projected cull cow receipts.  Again, O'Brien acknowledged that there are legitimate reasons for variation in cull cow receipts.  Cull cow receipts are based on the weight of the cow when it is culled, which varies substantially between breeds.  (Tr. 421).  An Angus cow may weigh 950 pounds, while a Hereford or Charolais may weigh 2000 pounds.  (Tr. 502).  It is also dependant upon the management practices of the producer.  If the cow is culled when it is in relatively good shape, it will weigh substantially more, and bring more money at market, than if it is culled in a more dilapidated condition.  (Tr. 421-422).

87.   The values used for the Shiplets 1994 and 1995 cull cow receipts were established by the state and county averages.  (Tr. 505).  The Shiplets did not present any evidence to the agency, to the ALJ, or to this Court that their actual receipts exceeded that projection.

### 4.   Family Living Expenses

88.   O'Brien also makes a comparison of the estimated family living

expenses for the Shiplets as opposed to certain other selected borrowers.  (Ex. 446,

461).  Again, O'Brien acknowledges that there can be legitimate differences in living

expenses from producer to producer.  Some simply live more frugally than others.

(Tr. 413).  In this case, the Shiplets' family living expenses were actually provided

by the Shiplets.  In their 1994 application, the Shiplets reported their actual family

living expenses were $25,631.  (Cx. 43).  The $24,000 amount ultimately used for

living expenses was provided by the Shiplets' accountant and financial advisor,

Mikell Nelson.  (See Cx. 45 (1994 plan), and Cx. 59 (1995 plan)).  The Court finds

the Shiplets were clearly in the best position to evaluate their annual living expenses.

In addition, throughout the multiple appeals which followed both applications, the

Shiplets did not object to the allocation for living expenses.

89.   Moreover, contrary to O'Brien's testimony that there were 2 to 2.5

people living on the ranch, Shiplet testified before the ALJ that there were generally

three families living on the ranch.  (ALJ Tr. 1, p. 172-173).  No evidence was

presented by Shiplet to establish how many of these individuals or families were

included in the Shiplets' family living expenses for the relevant years.

### 5.   Other Farm Income

90.    Shiplet also contends that some of the selected borrowers were given an allowance for other farm income, such as receipts for oil and gas leases, timber sales, and hunting and fishing revenues.  She contends that the Shiplets similarly should have been given credit for such income on their farm and home plans.

91.    As to receipts from timber sales, and oil and gas leases, there was evidence that the Shiplets may have had revenue from those sources in the late 1970's.  (Tr. 539).  No evidence was presented that the Shiplets had any income from oil and gas leases or from timber sales during the relevant time frame.

92.    O'Brien did not identify any evidence that the Shiplets had any receipts from oil, gas, or timber during 1994 or 1995.  (Tr. 398-399).  Baquet also reviewed the Shiplets' income tax returns, and found no evidence of any income from those sources.  (Tr. 539).

93.    With respect to hunting revenues, the evidence indicates that the Shiplets leased the hunting rights on their property to their son, Robert Shiplet, Jr., for $1,000 per year.  (ALJ Tr. 2, p. 163).  There is no evidence that any of those revenues were infused back into the operation.  (ALJ Tr. 2, p. 163; Tr. 398).  The Shiplets' own farm and home plans, prepared by their financial advisor and accountant, show projected receipts of $1,000 for a hunting lease in 1994 and 1995,

and that projection was carried over onto the Shiplets' farm and home plan with

FmHA.  (Cx. 45, 59; Tr. 397).

94.    In addition, there was no evidence offered that the Shiplets ever

requested, or were ever denied, the inclusion of revenues of this nature by FmHA.  If

the Shiplets did, in fact, have potential income from oil, gas, timber, or hunting, the

responsibility of providing that information rests with the Shiplets.  The Court finds

that FmHA cannot be faulted for failing to include information that was not provided

to them.

### 6.    Loan History

95.    Shiplet also introduced a number of tables focusing on the five

principal selected borrowers.  In general, the tables consist of a summary of portions

of the borrowers' farm and home plans; a summary of the loans and subordinations

made to each borrower; a comparison of the planned and actual income for each

borrower; and a summary of the assets, debts, and equity for each borrower.  The

defendant introduced corresponding tables prepared by FSA loan specialist, Marilyn

McMullen (McMullen) containing the same summaries and comparisons, which

highlight defendant's disagreements with the figures and conclusions in the Shiplet's

summaries.

36

96.    The Court finds that Shiplet's tables do not accurately represent the status of the borrowers' accounts in certain material respects.  For example, the Shiplet's loan and subordination summaries include all restructured loans, which did not involve the advancement of any new money to the borrower.  (Tr. 640-647).  Since the five principal selected borrowers were all distressed borrowers, their loans were restructured on multiple occasions under the agency's loan servicing process.  Counting these restructured loans as new loans misrepresents the amount of financing actually provided to the borrowers.  For example, O'Brien's tables show that from 1981, the Baileys received 45 new loans totaling four million dollars.  (Tr. 184).  In reality, they only received five new loans totaling $179,550 during that period.  (Tr. 663; Ex. 47, p. 1).  All remaining transactions with the Baileys involved restructures of existing loans, with no new money advanced to the Baileys.  (Tr. 666).

97.    O'Brien's loan and subordination tables also include subordinations which were later replaced by a subsequent subordination; thus, the subordinations are double counted in the total.  (Tr. 645-647).  The defendant's tables note where a subordination was replaced by a later subordination, and do not include the replaced subordination in the total for the year.  (See e.g., Ex. 47-001; Tr. 646-647).

98.    In addition, O'Brien's farm and home summaries do not include some

relevant entries, such as cash carry-over and capital expenditures.  (Tr. 641)  He also,

at times, substitutes actual production numbers for projected numbers.  The actual

production numbers are not the projected information used by FmHA in rendering

its loan making determination each year.  (Tr. 659-662).

99.    Shiplet contends that O'Brien's farm and home plan summaries show

that the principal selected borrowers were approved for loans in years in which their

farm and home plans did not cash flow, contrary to agency regulations.  In general, a

plan cash flows if the farm and home plan shows sufficient on and off-farm income,

after the USDA loan is made, to cover operating expenses, living expenses, and all

principal and interest due on all outstanding loans. (Tr. 50-52; See e.g., Ex. 46, line

15 & 16).

100.   Using this criteria, several of the principal selected borrowers did not

cash flow in certain years.  However, during this period FmHA operated under a

"continuation policy."  (Tr. 626).  This policy was first adopted in February 1982.

(Ex. 91).  It allowed FmHA offices to advance operating credit to existing borrowers

if they could show a "reasonable chance to repay any new loan for 1982 production

purposes plus interest accruing on that loan."  (Ex. 91).  The continuation policy was

extended in October 1982, 1983, and 1984, and was ultimately adopted by Congress

in the Supplemental Appropriations Act of 1987, P.L. 100-71, and was in effect until

1996.[5]  (Ex. 92, 93, 94; Tr. 640).  Under the continuation policy, operating loans

could be advanced to existing borrowers if the balance available on line 16 of the

farm and home plan was sufficient to pay the new operating loan, plus interest.  (Tr.

640).

101.  With the possible exception of a farm ownership loan to the Baileys in

1982, and another economic emergency loan to the Bailey's in 1984,[6] all of the

remaining loans to the selected borrowers during this time period were authorized

under this policy.

102.   The Baileys also received operating loans in 1981 and 1982.  (Ex. 47-

001).  They cash flowed for all purposes in 1981, and cash flowed for purposes of an

operating loan in 1982.  (Ex. 46, p. 1).   The Baileys received no new loans from

FmHA after 1984.  (Tr. 663).

---

[5] O'Brien testified that the continuation policy was only in effect from 1982 through 1985, and only applied when a borrower had applied, and was under consideration, for loan servicing.  (Tr. 250-51).  There are no such limitations in the FmHA administrative instructions, and O'Brien was apparently not aware of the adoption of the policy into law in 1987.  (Tr. 375).

[6] McMullen testified that both of these loans were made for capital expenditures, not operating credit, and there was no explanation in the FmHA record why they may have been made without full cash flow.

103.   The Bryans received an economic emergency loan in 1981, which was to be used as operating credit.  (Ex. 53, p. 1, Ex. 57, p. 4; Tr. 671-672).  All of the remaining loans to the Bryans from 1982 through 1991 were also for operating loans.  (Ex. 53, pp. 1-2; Tr. 673).  The Bryans cash flowed for purposes of repayment of their operating loans in each of those years.  (Ex. 52; Tr. 673).

104.   The Collins received two farm ownership loans and a farm operating loan in 1981.  (Ex. 59).  Their plan cash flowed for all purposes that year.  (Ex. 58; Tr. 676).  The Collins also received an economic emergency loan in 1986, which was for operating credit.  (Ex. 59; Ex. 63, p. 24; Tr. 677-679).  The remaining loans to the Collins were also operating loans.  (Ex. 59; Tr. 677).  The Collins plans cash flowed for purposes of operating loan repayment in each year after 1981.  (Ex 58; Tr. 681).

105.   The Kamps received an operating loan and an economic emergency loan in 1981.  (Ex. 65, p. 1).  They cash flowed for all purposes in 1981.  (Ex. 65, p. 1; Tr. 684).  The Kamps also received an economic emergency loan in 1986, which was for operating purposes.  (Ex. 65, p. 1; Ex. 69, p. 28; Tr. 685).  All remaining loans after 1981 were also operating loans.  (Ex. 65, p. 1, 2; Tr. 685).  They cash flowed for purposes of repayment of the operating loans in every year after 1981.  (Ex. 64, pp. 1-2; Tr. 685).

106. Matthew Levers assumed an existing loan with FmHA in 1982. (Ex. 71, p.1; Tr. 689). Thereafter, he obtained an emergency loan in 1986, and an operating loan in 1988. He cash flowed for all purposes in both years. (Ex 70, 71; Tr. 692).

107. Shiplet also points out that the selected borrowers often did not meet their income projections used in their farm and home plans. This is only marginally relevant. The question is whether Shiplet was discriminated against in calculating her farm and home plan. Also, there were drought disaster declarations in this area in 15 out of the 20 years between 1981 and 2001. (Tr. 357). Given these difficult years, the Court finds that it is not unreasonable to find crop receipts which were predominately below the averages projected. Indeed, O'Brien acknowledged that the Shiplet's actual production in 1994 and 1995 was "well below" the projections used in their farm and home plans. (Tr. 431-433).

### 7.   Limited Resource Rates

108. Shiplet also alleges that many of the selected borrowers received "limited resource" rates, while she was not given the same consideration. FmHA's interest rates on direct farm ownership and operating loans can be made either at the regular FmHA rate, or at a lower, limited resource rate. In order to qualify for the

limited resource rate, the borrower must demonstrate that they cannot cash flow at the regular FmHA rate.  (Tr. 340, 342-343).

109.    The majority of the original loans provided to the selected borrowers were at the regular FmHA rate.  (Tr. 664, 707).  However, when loans are restructured as part of FmHA's loan servicing of its direct loans, they are often moved to the limited resource rate.  In such circumstances, borrowers are generally distressed, and cannot cash flow at the regular rate.  (Tr. 341-342).  If they did not cash flow at the regular rate, the selected borrowers were entitled to a limited resource rate.  (Tr. 343).

110.    The Shiplets were not eligible for a limited resource rate in 1981 and 1984.  The Shiplets had a guaranteed loan, and the limited resource rate only applies to direct FmHA loans.  (Tr. 494).  Shiplet contends that FmHA similarly had the ability to reduce the rate on a guaranteed loan through an "interest rate buy-down." However, the Shiplets had an emergency livestock guaranteed loan in 1981, and a guaranteed economic emergency loan in 1984.  (Tr. 495).  The interest rate buy-down program was not available for either of those types of loans.  (Tr. 495, 600-601).  Interest rate buy-downs were only available on operating, farm-ownership, and soil and water guarantees.  (Tr. 601; <u>see also</u>, COL # 98, *infra*).

111.   In addition, even if the Shiplets were eligible to receive the direct loans applied for, O'Brien has acknowledged that the Shiplets would not have qualified for a limited resource rate in 1981, since their farm and home plan was strong enough for them to repay at the regular FmHA rate.  (ALJ Tr. 2, 143).  Also, the Shiplets were considered for a limited resource rate on both their 1994 and 1995 applications, but failed to cash flow even at the lowest FmHA rates.  (Tr. 346, 482-483).

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

1.   The Court has jurisdiction pursuant to 7 U.S.C. § 2279, note, and the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 *et. seq*.  ECOA creates a private right of action against a creditor who discriminates against an applicant "with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age . . . ."  15 U.S.C. § 1691.  Because the statute defines creditor to include the "government or governmental subdivision or agency," this section has been construed to constitute a waiver of the United States' sovereign immunity.  19 U.S.C. § 1691(f); Moore v. USDA, 55 F.3d 991, 994-95 (5th Cir. 1995);  Williams v. Connor, 522 F.Supp.2d 92, 99 (D.D.C. 2007).

2.   The statute of limitations for claims under ECOA is extended, for purposes of this case, under 7 U.S.C. § 2279, note.  That enactment provides that the

United States District Court shall have exclusive original jurisdiction over any civil action seeking judicial review of any administrative proceeding in the Department of Agriculture of a complaint alleging discrimination during the period beginning January 1, 1981 and ending December 31, 1996.  7 U.S.C. § 2279, note, subsections (d) and (e).

3.      Venue of this action against the United States is proper in the Billings Division of the District of Montana, because Shiplet resides in Park County, Montana, and some of the acts or omissions complained of occurred in Park County. 28 U.S.C. § 1391; L.R. 1.11(a), 1.9(a).

### B.      Standard of Review

4.      Pursuant to 7 U.S.C. § 2279, note, subsection (g), the Court reviews de novo the Agency's denial of Shiplet's complaint.  See Order of February 15, 2006 (Court's Doc. No. 25) at 2-5.

### C.      Applicable Law

5.      A credit applicant may prove unlawful discrimination under ECOA using one or more of three theories: (1) direct evidence of discrimination; (2) disparate impact analysis ; and (3) disparate treatment analysis. See, e.g., Faulkner v. Glickman, 172 F. Supp. 2d 732,737 (D. Md. 2001); AB&S Auto Service, Inc. v. Southshore Bank of Chicago, 962 F. Supp. 1056, 1060 (N.D. Ill. 1997).  Shiplet

appears to argue her case under both a direct evidence and disparate treatment theory. As will be discussed below, to prevail under either theory she must prove by a preponderance of the evidence that agency employees were motivated to deny her credit benefits or treat her less favorably than other credit applicants because of her sex, marital status, or age.

### D.   Shiplet's Claims

#### 1.   Direct Evidence of Discrimination

6.   Shiplet may establish a discrimination claim, without resort to the McDonnell Douglas burden-shifting analysis, by establishing by a preponderance of the evidence that a protected characteristic played a motivating factor in the challenged action.  See e.g. Costa v. Desert Palace Inc., 299 F.3d 838, 853-54 (9th Cir. 2002).  With respect to Shiplet's claim on this appeal under a direct evidence theory of discrimination, the ALJ issued extensive, detailed findings and conclusions rejecting Shiplet's claim.  (ALJ Det. at 14-27).  The Court has conducted a de novo review of the record, and finds that the ALJ's findings and determination are well supported by the record, and should be adopted as follows.

7.   Shiplet's direct evidence case relies almost entirely on statements that she claims Meredith made during the meeting that he had with the Shiplets and their attorney on February 21,1995, to discuss his decision to deny the Shiplets' 1994 loan

application.  As demonstrated below, during the period following that meeting,
Shiplet progressively exaggerated Meredith's statements to the point that her
description at the ALJ hearing of what he said on February 21, 1995, bears little
resemblance to what the ALJ, and this Court, find he actually said, as set out in the
following two paragraphs.

8.      During the meeting on February 21, 1995, Meredith advised the Shiplets
that "given your age and health," they should consider reducing the emotional stress
caused by their financial burdens by selling some of their noncontiguous land and
using the proceeds to reduce their debts.  When Meredith gave this advice, Shiplet
was 56 and her husband was 68 or 69 with poor and declining health.  Their ranching
operations had been losing money for years, even when cattle prices were high. They
had been able to keep the enterprise alive only by subsidizing it with non-farm
income and deferring maintenance. They had sold foundation cattle to meet their
bankruptcy plan payments, causing a significant reduction in the capacity of the ranch
to generate income. They were unable to pay taxes and expenses and service their
existing debts, despite being relieved through bankruptcy of their obligations to repay
approximately $277,000 to their creditors.  Lowering their interest costs with
refinanced debt would not render the operation viable.  Under these circumstances,
the Court finds that Meredith's advice to sell land and reduce debt was consistent with

his duties as a credit counselor to loan applicants, and did not manifest an intent to deny the Shiplets' loan application because of the age and health of either Mr. or Mrs. Shiplet. (ALJ Tr.3, pp. 291-92).

9.      During his meeting with the Shiplets and their attorney, Meredith told Shiplet that she was not eligible for funding under the agency's socially disadvantaged program ("SDA") because she owned the ranch jointly with her husband, and because government records indicated that the ranch had long been a joint operation.  When Meredith learned shortly thereafter that he was incorrect, and that Shiplet, as primary loan applicant on the 1994 and 1995 applications, was indeed eligible for SDA funding, Meredith informed the Shiplets of his new understanding in a letter to her counsel dated February 23, 1995.  (Gx. 1, p. 1541).  That Shiplet was eligible for an SDA funding did not, however, alter the feasibility analysis of the Shiplets' 1994 loan application.

10.      At the hearing before the ALJ, Shiplet testified that during the meeting on February 21, 1995, Meredith made the following statements to her and her husband in the presence of Terry Schaplow, her attorney in this proceeding:

> "I am not going to make any loans to any old people like you," was his exact quote, the first thing he said....
>
> "I like to make loans to young men just starting out, just starting out in business....

[Y]ou and Bob [Mr. Shiplet] have had your chance.... [I]t is time
to let some young men take over now....

I don't let any women get loans that own their land with their husband....

I am not making any loans to women who own their land with their
husbands." [ALJ Tr.1, pp. 76-79]

11.    The ALJ found that Meredith credibly denied under oath making the

statements that Shiplet claims he made on February 21, 1995. (ALJ Tr.3, pp. 294-97).

Given Meredith's education, training, and experience, the Court finds it is highly

unlikely that he would have made the blatantly discriminatory statements that Shiplet

claims he made on February 21, 1995, particularly in the presence of two witnesses,

including her attorney.

12.    Shiplet also claims that on February 22, 1995, the day after Meredith

allegedly made these statements, she prepared a handwritten letter to Meredith

summarizing the discriminatory statements he had made, and then mailed it to him

after sending a copy via fax to Schaplow. (ALJ Tr.1, pp. 78-79; ALJ Tr. 2, pp. 21-25;

Cx. 53).  These claims are not credible for the following reasons.

13.    The letter dated February 22, 1995, that purportedly documents what

Meredith said on the previous day, does not confirm Shiplet's testimony at the ALJ

hearing.  Rather than report explicitly discriminatory statements, the letter instead

asserts that Meredith apologized that the agency did not have programs specifically

designed for Shiplet and her husband.[7]  The entire text of the letter reads as follows:

> I am writing this letter to let you know that I found your statements
> concerning me & my husband's eligibility for agricultural loans
> unecessary [sic], discriminatory & offensive if not outright illegally
> [sic] discriminatory -To state that unfortunately REDC [sic] had
> no programs for the old & disabled that would cover my husband
> or for women who hold ownership jointly and file income tax
> jointly with their husbands smacks of discrimination both sex &
> age-

> It was uncessary [sic] for you to strip my husband of his dignity
> when thats [sic] about all he has left and to do it the day before Iwa
> [sic] Jima Day, a day of infamy where 50 years ago he served his
> country so valiently [sic].  I found your statement cruel & offensive.

> Upon being questioned, when I asked "Do you make any loans to
> married women because all the ranch women I know own their
> property jointly for inheritance purposes?"  You replied, "Indian
> women don't and we do make loans to married Indian women."

> You gave me the impression that you were doing everything you
> could to block my loan.  When I said, "I thought the FHA would
> help us make our ranch loan work and that the program cash
> flowed in Aug when Dick Parker wrote the loan.  Then when Vern
> Tesh [sic] refigured our loan he said it wouldn't work & seemed dead
> set on denying our loan even after we followed all of his instructions,"
> you made no reply.

> We feel Dick Parker is right and that we are right.  According to our

---

[7]  As noted in the text, _supra_, Meredith's understanding of the agency's
socially disadvantaged applicant program was incorrect, which he acknowledged in
a letter sent to the Shiplets' counsel a few days after the meeting on February 21,
1995.

accountant this loan will definitely cash flow-

Please approve it- [Cx. 53]

14. Meredith and his office did not receive the letter dated February 22, 1995, in the ordinary course of business following that date. He first saw it more than eight years later, a few months before the administrative hearing. (ALJ Tr. 3, p. 294).

15. When first prepared, the letter was dated February 20, 1995, the day before the Shiplets met with Meredith. At some subsequent time, the "0" in the date was crossed out and changed to "2" with a different pen than the pen used to write the letter originally.

16. Schaplow's invoices to the Shiplets indicate that he charged them on numerous occasions for reviewing documents that they faxed to him. His invoice covering the period after February 21, 1995, does not show any charge for reviewing a fax. (ALJ Det. at 17, ¶ 2. citing to the Office of Civil Rights (OCR) report, pp. 74, 77, 88, 91, 93, 95, 101, 104, 106).

17. Although the ALJ directed Schaplow to search his files and produce a copy of the letter for the record in the administrative proceeding, no such copy was produced. (ALJ Tr. 2, pp. 25-26). If Shiplet had faxed the letter to Schaplow as she claims, his copy would reveal a printed notation affixed by the fax machine in his

office indicating when it was received.   The ALJ noted that Shiplet's post-hearing brief abandoned the contention that the letter dated February 22, 1995, was faxed to Schaplow.

18.    On March 3, 1995, Schaplow wrote a lengthy letter to Meredith addressing issues that had been discussed at the meeting on February 21, 1995.  This letter says nothing about the blatantly discriminatory statements that Shiplet claimed at the administrative hearing were made by Meredith to the Shiplets and Schaplow at the meeting.  (Cx. 56).

19.    The Shiplets appealed Meredith's decision of January 24, 1995, denying their loan application of August 14, 1994, to USDA's National Appeals Division ("NAD").  Schaplow represented Shiplet in that appeal.  Both Shiplet and her husband appeared before a hearing officer from NAD on April 25, 1995.  The hearing officer's affirmation of Meredith's decision was in turn affirmed by the Director of NAD.  Shiplet did not allege during the appellate litigation that Meredith had made discriminatory statements to her while justifying his denial of the Shiplets' 1994 loan application. (ALJ Tr. 3, p. 313; Gx.1, pp. 1807-28; Gx 4, pp. 10, 12) .

20.     After the Shiplets unsuccessfully appealed Meredith's denial of their 1994 loan application, and after Meredith denied their 1995 loan application, Shiplet prepared a letter to Meredith that, among other things, purports to document the statements that Meredith made at the meeting on February 21, 1995.  That letter, dated January 30, 1996, states in part:

> It is difficult for me to understand why you keep harassing, lecturing and objecting to everything I do when I continually request your assistance in helping me make my loan work.  I realize the first hearing you had with me in the presence of my husband you flatly stated that you had no intentions to make a loan to a veteran or anyone as old as we are.  When I asked who you intended to make loans to you replied that you would be willing to make a loan to someone just starting in the business.  Although you claimed that I was ineligible you did say that you do make some loans to Indian women on the reservation.  This smacks of age and gender discrimination. [Gx. 1, p. 2112]

21.     What Shiplet reported as Meredith's apology on behalf of the agency in the letter dated February 22, 1995, she transformed in the letter dated January 30, 1996, into unequivocal statements of personal intent: "[Y]ou flatly stated that you had no intentions to make a loan to a veteran or anyone as old as we are."  The letter dated January 30, 1996, then adds a new charge: "[Y]ou replied that you would be willing to make a loan to someone just starting in the business."  By the time Shiplet got to the administrative hearing, this particular allegation had been changed so that Meredith supposedly said on February 21, 1995, that he favors not just someone

52

younger than Shiplet and her husband, but young men: "I like to make loans to young men just starting out ...."

22.    In sum, the letter dated January 30, 1996, is an exaggerated version of the allegations contained in the letter dated February 22, 1995, and Shiplet's testimony before the ALJ appears to be an exaggerated version of the allegations in the letter dated January 30, 1996.  At each stage Shiplet made clearer and stronger allegations that on February 21,1995, Meredith made statements manifesting unlawful discriminatory animus against her.

23.    The letter dated January 30, 1996, was not mailed or delivered to Meredith at that time.  Shiplet hand-delivered it to Meredith on April 8, 1996.  (Cx. 76). Shiplet concedes that the letter was not written on January 30, 1996.  She claims that she put that date on it because that was a date on which she and Meredith were scheduled to meet.  This explanation is not credible.  January 30, 1996, was only one of several dates that Meredith offered for a meeting in December 1995, January 1996, and February 1996, but the parties never agreed to meet on that date, and in fact did not meet on that date.[8]  Shiplet's explanation for the date that she put on the letter

_____

[8]  The record shows the following meetings were proposed, scheduled, cancelled, or aborted during the period following the Shiplet's request to meet with Meredith regarding his denial of the Shiplets' 1995 loan application: meeting scheduled for 12/19/95; Shiplet cancels meeting on 12/18/95; meeting rescheduled for 12/27/95 at Shiplets' home by letter requesting response if unsuitable; no

provides further evidence that her letters, allegedly prepared to document meetings

with government agents, do not fully and accurately reflect what occurred.[9]

24.     During a conference call with counsel for the parties that was conducted

early in the administrative proceedings, the ALJ informed Schaplow that, pursuant to

the attorney/witness rule, he could either testify regarding the meeting that he and the

Shiplets had with Meredith on February 21, 1995, or he could continue to represent

Shiplet, but he would not be allowed to do both.  As discussed above, Shiplet cannot

prevail without proving that USDA employees were motivated to deny her credit

benefits or treat her less favorably than other credit applicants because of sex, marital

status, or age.  Given that Shiplet's ALJ testimony regarding the explicitly

discriminatory statements allegedly made by Meredith during the meeting on

February 21, 1995, constitutes the strongest direct evidence of unlawful

response; meeting with Shiplets on 12/27/95 is aborted after Meredith is told
meeting is unwelcome and unscheduled; letter sent 1/3/96 to Shiplets' attorney
asking for meeting 1/6/96; no response; another letter sent 1/18/96 to attorney
setting deadline to hold meeting of 2/12/96, suggesting meeting dates of 1/29/96,
1/30/96, and 2/1, 2, or 3/96; no response from attorney or Shiplets.  (Gx. 4 p. 14).

[9] Shiplet incorrectly argues that Meredith remained silent in the face of the
allegations of discrimination set out in the letter dated January 30, 1996, thereby
conceding the truth of those allegations. On April 9, 1996, the day after Mr.
Meredith received the letter dated January 30, 1996, he responded in a letter to the
Shiplets' counsel that acknowledged the discrimination complaints and provided
the proper address to which such complaints should be directed.  (Cx.76, p. 2).

discriminatory motives that Shiplet has to offer in support of her case, and given that Schaplow supposedly witnessed those statements, it is reasonable to expect that Schaplow would have ceased representing Shiplet so that he could corroborate her testimony on this critical element of proof.

25.    For these reasons the Court concludes that, contrary to Shiplet's sworn testimony and the letter dated January 30, 1996, Meredith did not make the explicitly discriminatory statements that Shiplet claims he made on February 21, 1995. Furthermore, the preponderance of the evidence indicates that the letter that Shiplet contends she prepared, mailed, and faxed on February 22, 1995, was not mailed to Meredith, was not faxed to Schaplow, and was not prepared on February 22, 1995, but rather on some later date. These conclusions undermine not only Shiplet's direct evidence case, but also her credibility in general.  The Court also finds that a number of additional facts undermine Shiplet's credibility.

### a.    Financial Statements Undermine Shiplet's Credibility

26.    In 1980 and 1981 the Shiplets purchased land on contract from the Shields River Bench, but they did not reveal the debts that they incurred as a result of those transactions in financial statements that they subsequently submitted for the

purpose of obtaining loans from First Security and from FmHA.  (Cx.3; Cx.4; Cx.6; Cx 8; Cx.17; Cx.19; Cx.24A; Cx.26).  Although the financial statements were signed by both Mr. and Mrs. Shiplet, Shiplet testified that she prepared them.  When confronted with these omissions on cross-examination during the administrative hearing, Shiplet first explained that her failure to include these debts on the financial statements was the result of "clerical error," and that she must have "overlooked" them.  (ALJ Tr.  2, pp. 52, 57).  After a break in the hearing, Shiplet changed her testimony and stated on redirect examination that she did not list the debts on the financial statements because she "didn't think they were liens," and because Parker told her that she did not have to do so because her daughter's name was on the contracts.  (ALJ Tr. 2, pp. 92-93).

27.      Shiplet's explanations are not credible.  Shiplet was a school teacher with a master's degree.  (Cx.4, p. 1; ALJ Tr. 1, p. 129).  It is unlikely she failed to understand that lenders require a true and complete financial statement as part of a loan application so that they can accurately assess the risk of loss if a loan is granted.  When the Shiplets failed to disclose the obligations that they incurred through the Shields River Bench purchases, they significantly distorted their financial picture, giving the impression that they were in better financial condition than they were.  For example, in 1982, at the time that they made disclosed payments of

56

$52,800 on disclosed land purchases, they also made undisclosed payments of almost half that amount ($25,592) on the undisclosed Shields River Bench contracts.  In 1982, these undisclosed payments constituted nearly 30% of the Shiplets' reported gross farm income, and nearly 100% of the $26,000 that Shiplet earned from teaching school.  No one can innocently "overlook" bills equal to her gross wages for an entire year.  (Cx. 8).  In sum, no credit can be given to Shiplet's attempt to explain away these material distortions to the Shiplets' financial condition as insignificant "clerical error".

28.    Shiplet's explanation that she did not disclose the Shields River Bench contracts for deed because she "didn't think they were liens" likewise is not credible. All of the Shiplets' financial statements submitted to FmHA list various parties from whom they purchased land on contract over the years.  Included in these lists is "Swandal", a name that Shiplet consistently listed as having a lien on their real estate. Shiplet's repeated treatment of the Swandal land contract as a lien belies the explanation that Shiplet offered at the ALJ hearing for her failure to disclose the Shields River Bench contract debts.

29.    Even though land-sale contracts do not in themselves create liens, if the purchasers do not pay the entire contract price at the time of purchase, the contracts

create a debt.  A purchaser of land on contract who incurs a debt and thereafter applies to USDA for a loan can be expected to list such debt on the agency's financial statement form under the category of "all other debts." (See, e.g.,  Cx.8).  Shiplet did not do so.

30.    Shiplet also testified at the administrative hearing that her daughter's name was on the contracts, and that  Parker told her that she did not have to disclose these contracts for that reason.  However, the Supreme Court of Montana did not find that the Shiplets' daughter's name was on the 1980 contract.  Burgess, 230 Mont. at 389, 750 P.2d at 461.  Therefore, even if Parker told Shiplet that they did not have to disclose a contract debt shared with their daughter, that statement would not justify the Shiplets' failure to disclose the 1980 contract obligation on their financial statements.  In any case, the daughter's joint ownership of the land purchased in 1981 did not extinguish her parents' joint liability for the debt created by the 1981 contract; her joint ownership only changed the nature and extent of the liability that the Shiplets incurred through that contract.  Therefore, both contract debts should have been revealed on the financial statements.  Moreover, inasmuch as Parker obviously did not have authority to speak for the bank, his alleged statement would not excuse the Shiplets ' repeated failure to disclose both the 1980 and the 1981 contracts on financial statements submitted to the bank.

31.    It is also unlikely that Parker advised Shiplet to submit materially false financial statements in support of the Shiplets' loan applications in that he could have been accused of conspiring with the Shiplets to defraud the government had he done so.

32.    Finally, if Shiplet truthfully recounted Parker's statement regarding the Shields River Bench transactions, that statement would clearly manifest an intent to help the Shiplets create a falsely positive financial picture, thereby increasing their chances of qualifying for a loan.  This does not demonstrate that he harbored discriminatory animus against her.  Shiplet's contention that Parker excused her from listing all of the Shiplets' debts on their financial statement undermines her theory that Parker secretly used his power as county supervisor to prevent the Shiplets from getting the loans for which they qualified in the 1980s, because he was prejudiced against Shiplet based on her sex, age, and marital status.  In short, if true, Shiplet's testimony on this issue by itself would refute her contentions based on Parker's conduct.

> **b.    Testimony Regarding the Date that Discrimination Began**

33.    Shiplet testified at the administrative hearing that she took over responsibility for "running the ranch" from her husband on August 3, 1981, when he

became seriously ill.  She also testified that she communicated this fact to Parker on that date. (ALJ Tr.  1, pp. 22-23).  This testimony supports Shiplet's argument that the agency began discriminating against her in 1981 when Parker learned that she, rather than her husband, was "running the ranch."

34.     The documentary record, however, appears to contradict Shiplet's hearing testimony.  On August 7, 1997, the Shiplets told Melissa J. Cummins, a USDA civil rights investigator, that "FSA began treating them differently and discriminating after Mr. Shiplet had his heart [attack], stroke and by-pass [sic] surgery in 1982.  At this time they state Mrs. Shiplet took over the day to day affairs of running the family ranch." (Gx.4, p. 9 (emphasis added)).  Shiplet said much the same thing in her affidavit of December 18, 1997, in which she stated under oath that she "became the key operator" of the ranch after her husband's heart attack. (Cx. 99, p. 16).

35.     These statements comport with the findings of an administrative law judge for the Social Security Administration on July 11, 1983, that Mr. Shiplet became disabled and stopped working as a heavy equipment operator on June 4, 1982, when he had a heart attack.  Mr. Shiplet was admitted to the hospital for heart bypass surgery on July 11, 1982. (Cx. 9).

60

36.    On their application submitted to FmHA on September 14, 1981, the Shiplets certified that Robert Shiplet was employed by Wickens Construction of Springdale, and was projected to earn $16,346 dollars from his employment.  (Cx. 4). Since Mr. Shiplet was apparently not then disabled and was operating heavy equipment before June 4, 1982, he presumably was capable of "running the ranch" before June 4, 1982, as well.  Further, the record shows that Mr. Shiplet was actively involved in negotiations with FmHA and First Security during the period between August 3, 1981, and June 4, 1982, and beyond.  (Gx.1, pp. 28, 49, 57, 64,  65, 277, 308, 1497).  The Court therefore concludes that, contrary to Shiplet's sworn hearing testimony, she did not inform Parker on August 3,1981, that she would be running the ranch thereafter, and she did not do so between August 3, 1981, and June 4, 1982.

37.    The significance of Shiplet's hearing testimony becomes clear in light of Shiplet's theory of the case.  She contends that she would have had a successful ranching operation, would not have been forced into bankruptcy in 1988, and would not have been forced to sell 2,560 acres of land in 1998 at an unfair price to pay the Shiplets' debts and a court judgment, if USDA employees had not discriminated against her beginning in 1981.  Her case is premised on the contention that discrimination began when Parker did not approve the Shiplets' September 14, 1981 application for a low-interest direct loan to payoff the guaranteed loan from First

Security.  Evidence to the contrary undermines her credibility, and her case on the

merits.

<u>c.</u>    <u>Nelson's "Admission of Liability"</u>

38.    Shiplet also testified that the Director of FSA for the State of Montana,

Bruce Nelson (Nelson), told her privately in 1997 that he believed Shiplet had been

discriminated against by the agency:

> He took a walk with me and he said he believed that they were
> discriminating against me, and he based that on the things [that]
> were coming across his desk and the statements that I had given to
> him, and that he also believed that there were other women in the
> state of Montana that he was talking to that had similar complaints.
> [ALJ Tr. 1, p. 180]

39.    Contrary to Shiplet's argument, Nelson's reported statement is not an

admission of liability by the agency.  *See generally* <u>Federal Crop Ins. Corp. v.</u>

<u>Merrill</u>, 332 U.S. 380, 383-384 (l947); <u>Saulque v. United States</u>, 663 F.2d 968, 974

(9th Cir. 1981).  It is, at most, a statement of belief or opinion that can be given

neither probative nor legal force in this proceeding.  Additionally,  Nelson reportedly

based his belief at least in part on statements made by Shiplet. Nelson's reported

statement was not corroborated by a disinterested witness.  It comes out of self-

serving testimony.  It was not tested by cross-examination.  It is impossible to

determine the exact nature, accuracy, and reliability of the information upon which

62

Nelson relied to make the reported statement, if he did indeed make it.  In sum,

Shiplet's testimony stating that Nelson believed that the agency had discriminated

against her gives no aid to her cause.

### d.    Cartoons in Record are Not Evidence of Discriminatory Animus

40.    During the ALJ hearing, Shiplet entered into evidence three cartoon

records that she found in her file at FSA's Montana office.  She argues that two of

them are direct evidence of discriminatory animus against her.  These cartoons appear

to have been taken from a printed notepad.  At the top of one of them is printed,

"More manure to add to the pile."  A printing of the same appears at the bottom of the

note.  The following handwritten text appears in the middle of the note:

> This report was sent to the US Attorney by the attorney for the First
> Security Bank.  The statement of conditions on page 5 prevent[s] FmHA
> from conveying any part of the report without written consent of the
> appraisers.  (Cx. 114).

41.    The second and third cartoons were found attached to a Freedom of

Information Act request.  (Cx. 91).  The second cartoon shows a man standing with

briefcase in hand, contentedly whistling, and oblivious to a giant hand looming out of

the clouds that is about to flick him away like a crumb on a tabletop.  No handwriting

appears on the note.

42.     The third cartoon shows what seems to be a penguin wearing overcoat, mittens, and sunglasses while standing in snow and gazing at a billboard advertising a seashore vacation and the tropical sun.  Again, no handwriting appears on the note.

43.     These cartoons are not instructive about the issues raised in this case. The unknown person or persons who put them in Shiplet's file could have chosen them purposely or randomly.  In either case, they do not demonstrate discriminatory feelings about anyone based on sex, age, or marital status.  Moreover, nothing in the record shows that agency employees who were responsible for the loan decisions at issue in this case had anything to do with these cartoons.  The cartoons therefore do not constitute evidence that agency employees discriminated against Shiplet when they made decisions regarding her loan applications.

44.     Based on the foregoing, the Court finds that Shiplet has not established ECOA claim based on direct evidence of discrimination.

### 2.     Disparate Treatment

45.     Disparate treatment claims also require that Shiplet prove that the defendant acted with conscious intent to discriminate.  Costa v. Desert Palace, Inc. 299 F.3d 838, 854 (9th Cir. 2002).  The Shiplet's disparate treatment claim may be properly considered under the framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Texas Dept. of

Community Affairs v. Burdine, 450 U.S. 248 (1981), St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), and their progeny.  See e.g., Mays v. Buckeye Rural Elec. Co-op., Inc., 277 F.3d 873, 876-77 (6th Cir. 2002) (adopting the McDonnell Douglas burden shifting analytical framework to ECOA claims); and Chiang v. Veneman, 385 F.3d 256, 267 (3rd Cir. 2004) (collecting cases which have done so).

46.    The first step in that process is to determine whether Shiplet can establish a prima facie case of discrimination.  The ALJ correctly set forth the elements of a prima facie case under the ECOA, stating Shiplet must prove by a preponderance of the evidence that:

1)    She is a member of a class or classes of persons protected by the statue;

2)    She applied for and was qualified to receive credit;

3)    Her application for credit was rejected; and

4)    Other similarly situated persons, not members of her protected class or classes were extended credit or given more favorable treatment.

(ALJ Det., p. 26, (citing Massey v. First Greensboro Home Equity, Inc., 1998 WL 23114, at * 10 (M.D. Fla. 1998); Mercado Garcia v. Ponce Federal Bank, F.S.B., 779 F. Supp. 620, 628 (D.P.R. 1991), *aff'd*, 979 F.2d 890 (1st Cir. 1992); Gross v. U.S. Small Business Admin., 669 F. Supp. 50, 54 (N.D. 1987), *aff'd*, 867 F.2d 1423 (2d

Cir. 1988); Williams v. First Federal Sav. & Loan Ass'n, 554 F. Supp. 449 (N.D.N.Y. 1981), *aff'd*, 697 F.2d 302 (2nd Cir. 1982)).

47.  If established, the prima facie case creates a rebuttable presumption of discrimination.  Burdine, 450 U.S. at 254.  In that event, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its allegedly discriminatory actions.  McDonnell Douglas, 411 U.S. at 802.  Once the defendant produces evidence of a legitimate nondiscriminatory reason for the action, any "'presumption of discrimination' drops out of the picture."  McGinest v. GRE Service Corp., 360 F.3d 1103, 1123 (9th Cir. 2004).

48.  Shiplet must then show that the defendant's proffered reasons were merely a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804; See also, Noyes v. Kelley Services, 488 F.3d 1163, 1168 (9th Cir. 2007).  "Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial."  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002).

49.  While intermediate evidentiary burdens shift back and forth under the McDonnell Douglas framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against Shiplet remains at all times with

Shiplet.  See e.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir.

2002);  Hicks, 509 U.S. at 506-11; Burdine, 450 U.S. at 253.

### a.    1981 & 1984 Applications

50.    Shiplet cannot establish the second element of a prima facie case as to

the Shiplets' 1981 and 1984 applications for direct loan assistance.  Specifically, the

evidence shows that the Shiplets did not qualify for the credit they requested.

51.    For USDA loans, the qualification element has two major components:

eligibility and feasibility.  Before a loan may be granted, the agency must first

determine whether the applicant is eligible for the loan by satisfying various statutory

and regulatory eligibility criteria.  If eligible, the agency determines whether the loan

is feasible; i.e., whether it is reasonable to expect that the loan will be repaid.  (ALJ

Tr. 3, pp. 264-65).  Because the agency determined that commercial credit was

available to finance the Shiplets' requested credit needs in 1981 and 1984, they were

not eligible for the direct loans they requested.

52.    As discussed above, the rates on USDA's farm loans are heavily

subsidized by federal taxpayers.  Consequently, the agency is precluded by law from

competing with commercial lenders.  In order to become eligible for a direct loan

from USDA, an applicant must be able to pass an initial "test for credit," requiring

the applicant to establish that he/she cannot obtain necessary credit from a

commercial lender.   For that reason, the agency is commonly known as the lender of

last resort.   This requirement is codified in 7 U.S.C. § 1922(a)(4), which provides

that an eligible applicant must:

> be unable to obtain sufficient credit elsewhere to finance their actual
> needs at reasonable rates and terms, taking into consideration prevailing
> private and cooperative rates and terms in the community in or near
> which the applicant resides for loans for similar purposes and periods of
> time.

53.    The requirement was similarly incorporated in the applicable regulations

for farm ownership and operating loans during this period.  Those regulations were

set forth at 7 CFR § 1943.6(b) (1981) and § 1941.6(b) (1981), respectively.  Both

regulations also require that "[if] the County Supervisor questions whether or not the

applicant is able to obtain the credit needed from other agricultural lenders in the

area, such lenders will be contacted and the findings recorded in the running record."

7 CFR § 1943.6(b) and 7 CFR § 1941.6(b).  The regulations also provided "[a]n

applicant will be requested to obtain credit from another source when information

indicates such credit is available."  7 CFR § 1943.27 (1981).

54.    The test for credit was also incorporated into the regulations for

economic emergency loans.  7 CFR § 1945.105(b) (1981).  That regulation required,

among other things, that the applicant certify, and that the county supervisor

determine, that "adequate credit elsewhere is not available to finance the applicant's actual needs."

55.    That is precisely what was done in this case in 1981.  While the Shiplets certified on their application that commercial credit was not available, Parker was obligated to contact the commercial lender to verify that information.  When it was determined that First Security was not requiring that the guaranteed loan be paid, and that First Security was, in fact, willing to continue with the Shiplets, they were not eligible for direct financing for the purpose expressly stated on their application.

56.    The same is true in 1984.  The Shiplets applied for direct FmHA financing to pay off their guaranteed loan.  Very shortly thereafter, however, the Shiplets and their counsel began discussions with the bank and the agency regarding a new guaranteed economic emergency loan.  This was followed by an application from the bank to FmHA for a guarantee on a loan to pay off the Shiplets' preexisting guaranteed loan, and provide additional financing for the Shiplets' operation.

57.    This again was in accordance with FmHA's regulations for economic emergency loans, which provided that "[i]f the applicant cannot qualify for the needed credit from the lenders contacted, but one or more of them have indicated they would provide credit with an FmHA guarantee, the applicant will be advised to file an application with that lender(s) so that a guaranteed EE loan request can be

processed by the lender for consideration by FmHA."  7 CFR 1945.105((b)(ii)

(1984).

58.    Shiplet has not satisfied her burden to establish that the Shiplets were

eligible for the requested direct loans from FmHA in 1981 and 1984.  Since the bank

was willing to extend commercial credit, FmHA was forbidden by statute and

regulation from extending direct financing for that same purpose.  Their ineligibility

for the requested loans means they did not qualify for the credit they sought.

59.    Shiplet contends that the loans from First Security Bank were not

commercially reasonable because of the interest rate on the note, and that they

therefore did not satisfy the requirements of 7 U.S.C. § 1922(a)(4).  Although the

rates were high by today's standards, they conformed to the prevailing commercial

rates of that time period.  There is little doubt that the interest rates during this time

period presented financial difficulties, not only to the Shiplets, but also other

agricultural producers and other non-agricultural businesses nation-wide.  These

difficult financial conditions, however, did not allow the agency to disregard its

congressional mandate to function exclusively as a lender of last resort.  If, as Shiplet

apparently contends, the agency was authorized to extend credit to the Shiplets

because their commercial rates were high, it would have essentially opened the door

to every farmer and rancher in the country to the agency's governmentally subsidized

rate.  The evidence established that the rate on the Shiplet's loans from First Security

Bank was then commercially reasonable.

60.     The ALJ also correctly noted that the Shiplets' behavior during this time

period contradicts their contention that they were in a distressed condition, unable to

function without FmHA financing.  When interest rates were at their high in 1980

and 1981, the Shiplets made large cash outlays for down payments on additional real

estate, and incurred significant additional debt.  As the ALJ commented, "the Shiplets

did not behave like ranchers in such financial distress that they had no alternative but

to seek taxpayer-subsidized credit from the government, the lender of last resort."

(ALJ Det., p. 28).

61.     Shiplet's disparate treatment evidence is not relevant to the 1981 and

1984 applications.  O'Brien's  disparate treatment analysis focuses on feasibility, not

eligibility.  The Shiplets were not denied financing in 1981 and 1984, or at any other

time prior to 1994, on the basis of feasibility.  They were denied because they were

not eligible.

### b.     1984 and1985 EM Loan Applications

62.      Shiplet also alleges that the Shiplets were discriminated against by the

length of time it took to process their 1984 and 1985 EM loan applications.  Given

the absence of legal authority to establish the elements of a prima facie case for

71

unreasonable delay in processing a loan, the ALJ found the proper criteria to be as follows:

1.   Shiplet is a member of a class or classes of persons protected by the statute;

2.   She applied for and received credit;

3.   The creditor caused processing of the Shiplet's credit application to take an unreasonable amount of time; whereas,

4.   The creditor processed the same type of credit applications from similarly situated persons, not members of the Shiplet's protected class or classes, within a reasonable amount of time.

63.   The ALJ concluded that Shiplet could establish the first two elements. (ALJ Det. at 32-34). The ALJ also concluded that the agency failed to show that it's contribution to the delay was reasonable, and thus, that Shiplet established the third element as to the 1984 and 1985 EM loans. (Id.). The ALJ nonetheless concluded that Shiplet could not establish a prima facie case because she did not prove that her applications were treated worse than applications filed by applicants who were not members of her protected class. (Id.). Like the ALJ, the Court concludes Shiplet has established the first three elements. As discussed below, however, Shiplet has not proven that her applications were treated worse than those of applicants not members of her protected class.

### i.   1984 EM Loan Application

64.     The Shiplets applied for their first EM loan on November 26, 1984, but the application was incomplete.  Upon receipt of the necessary information, the agency was able to make an actual loss calculation on April 19, 1985, and the Shiplets completed the required farm and home plan on that date as well.

65.      Once the actual loss calculations were made, and the farm and home plan was completed, the EM loan application was complete.  It was taken to the county committee on their next meeting date of May 14, 1985, and the Shiplets were certified as eligible for the EM loan by the county committee on that date.  The loan was subsequently approved by the county supervisor on June 21, 1985.  Since the loan was to be secured by real estate, it was necessary for the security property to be appraised and the title work completed.  Upon completion of the appraisal and obtaining the title work, an EM loan in the amount of $39,160 was closed on July 24, 1985.

66.     In all, from the time the application was complete on April 19, 1985, it took approximately three months to close the loan.  The Court finds this was not disproportionate to the time taken for processing other borrowers' loans in the same year.  While some were completed rather quickly, others took as long as the Shiplets.  For example, two other borrowers are identified in Exhibit 8 as having applied for EM loans in 1984, the Camerons and the Townsend Ranch.  The Camerons' EM loan

took only 43 days to process, while the Townsend Ranch EM loans took almost an identical time period as the Shiplets.  (Ex. 88, p. 3).

67.    Even if the total amount of time taken from the date of initial application to close could be considered unreasonable, the factors identified above  provide legitimate, nondiscriminatory reasons for the delay.  Had the Shiplets provided the necessary production histories and a completed farm and home plan at the time of their application, or soon thereafter, the loan would have been processed in substantially less time.  Also, any contention that these causes for delay were only a pretext for discrimination is contradicted by the fact that the Shiplets were not even to be the recipients of the loan proceeds.  The loan closing documents show that the proceeds were first to be applied to the closing costs, with the balance to be paid to First Security Bank of Livingston.  Consequently, while the Shiplets received the benefits of the loan by obtaining a reduction in the balance of their debt, they were not denied access to living or operating funds, and were not prejudiced by any delay.

### ii.    1985 EM Loan Application

68.    The Shiplets applied for a second EM loan on September 16, 1985. Again, their loan was incomplete.  Following unsuccessful attempts to contact the Shiplets by telephone, the agency wrote to Shiplets on November 4, 1985 and advised them that the agency needed additional information from the Shiplets to

continue processing their loan request.  In addition, the Shiplets did not submit a farm

and home plan that was necessary to complete their application.

69.     Because of the unprecedented number of EM loan applications in1985,

FmHA was required to hire contractors to assist the agency in processing the loans.

One of those contractors, the former chief of FmHA farmer programs, ultimately

went to the Shiplets' ranch on January 11, 1986, to assist them in preparing their farm

and home plan.  The contractor documented that the Shiplets had recently initiated a

bad faith action against First Security Bank, and that the soundness of the Shiplets'

operation would depend on a successful outcome of the litigation.  It was, therefore,

his conclusion that the 1985 EM loan should not be closed until the successful

conclusion of their litigation with the bank.

70.     Following receipt of the evaluation from the contractor, the FmHA state

office concluded on April 16, 1986, that the EM loan application did not meet the EM

lending requirements.  As a result, the county supervisor sent the Shiplets a letter

informing them of the denial on April 22, 1996.  Therefore, the loan processing was

complete, and a decision was rendered, approximately three months after obtaining a

completed application and farm and home plan from the Shiplets.  Again, the Court

finds this was not disproportionate to other borrowers during this same year.  There

was a wide variation in the processing times for EM loans in 1985.  While one EM

loan was processed in only 43 days, another took 556 days, and nine others took over 200 days.  (Ex. 88, pp. 3-4).

71.    The Shiplets then met with the county supervisor, and requested that the agency reconsider the denial.  After the receipt of additional information in June and July 1996, the county supervisor ultimately approved the loan, and notified the Shiplets of the approval of an EM loan in the amount of $40,220 on July 15, 1986.  However, closing of the loan was expressly conditioned on the satisfactory resolution of their litigation with the bank.

72.    The litigation was not resolved until 1988, and the ultimate resolution was not in the Shiplets' favor.  Nevertheless, the agency proceeded to close the loan.  When the closing documents were sent to an attorney in Livingston, the Shiplets objected because the attorney's firm was involved in the Shiplets' litigation against the bank.  They asked that the closing documents be sent to a partner in Schaplow's firm, William Bennett.  Bennett closed the loan on September 8, 1996, but was unable to disburse the funds, because the Shiplets had not provided the necessary consent and agreement forms from all parties having an interest in real estate being used as security for the loan.  Although Schaplow and the Shiplets were ultimately unable to secure the required consents from all parties, the agency nevertheless consented to disbursement of the funds, which took place on December 31, 1986.

76

73.    Again, even if the time period from initial application to closing may be deemed unreasonable, the factors identified above provide legitimate, nondiscriminatory reasons for the delay.  The Shiplets' failure to provide necessary loan information and documents; the Shiplets' failure to provide a farm and home plan; the unprecedented number of EM loan applications; the Shiplets' uncertain financial future because of their lawsuit with the bank; the initial feasibility determination and denial of the loan; the Shiplets' insistence on their attorney's firm as a closing agent; and then the Shiplets' inability to provide consent and agreement forms from all necessary parties, all contributed to the delay in processing the loan. These factors were not a pretext for discrimination.  Any discriminatory intent is again belied by the fact that none of the loan proceeds were intended for the Shiplets. In fact, Schaplow personally executed the disbursal checks, which were issued to the Shiplets' creditors, not to the Shiplets for any purpose.  They were not significantly prejudiced by the delay.

74.    Finally, Parker's treatment of the Shiplets' 1985 EM loan application refutes any contention that he intended to discriminate against the Shiplets.  He approved the loan against the advice and instruction of his superior in the Montana state office.  He made the loan contingent on a successful resolution of the Shiplets' suit against First Security, and then ignored the contingency and continued to close

the loan while the suit remained unresolved.  Then, he authorized disbursal of the

loan funds despite outstanding encumbrances that jeopardized the government's

security interest in the mortgaged property.  In other words, the record shows that

Parker repeatedly ignored grounds he could have readily relied upon to deny the

Shiplets' requested loan.  The Shiplets soon thereafter defaulted on the 1985 EM

loan, much of which was ultimately written off in bankruptcy at taxpayer expense.

<u>c.</u>      <u>1994 &amp; 1995 Applications</u>

75.    Shiplet also cannot establish that the Shiplets qualified for the credit

applied for in 1994 and 1995.  While the Shiplets may have been eligible in those

years, they did not qualify for the loans requested on the basis of feasibility.

Additionally, the agency was statutorily barred from giving the Shiplets the loan they

requested in 1995.

76.    Fresh out of bankruptcy in 1994, the Shiplets applied for $400,000 in

new direct loans.  Their request was set at the agency's statutory lending limits of

$200,000 for farm ownership loans and $200,000 for operating loans.

77.    A review of the Shiplets records at the time revealed that they had lost

an average of $36,500 per year for the previous 4 years while under bankruptcy

protection, and their farm and home plan completed in the application process

showed a projected negative cash flow of $34,516.  (Gx. 1, p. 1517, 1519).

78

Therefore, the Shiplets were denied the loan on the basis that their operation could not generate adequate income to service the debt they had accumulated, and because the agency's statutory loan limits were not sufficient to meet their total needs. As discussed above, this decision was upheld after multiple appeals.

78.   In fact, on appeal to NAD, the Shiplets were permitted to submit a new farm and home plan based on information submitted at the appeal hearing. That plan showed a balance available of $35,947 and annual debt payments of $98,889; a projected shortfall of $62,942, almost twice as much as projected by Meredith's analysis. (FOF # 56, *supra*).

79.   The 1995 application, submitted just weeks after the denial of the 1994 loan was upheld, was denied for the same reason. The Shiplets' financial condition had not improved from their application for the prior the year. In addition, the Shiplets were also ineligible to obtain the financing requested after the passage of the FAIR Act, because they had previously received a write-down of approximately $275,000 in FmHA financing in bankruptcy. (FOF # 59-61, *supra*).

80.   Since Shiplet cannot show that the Shiplets qualified for the credit they applied for in 1994 and 1995, the Court need go no further. A failure of proof concerning an essential element of the Shiplet's case necessarily renders all other facts immaterial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

81.    Shiplet has also failed to establish the fourth element of a prima facie

case for 1994 and 1995, i.e., that similarly situated persons, not members of her

protected class or classes, were extended credit or given more favorable treatment.

### i.    The Agency Calculations Were Not UnFair

82.    The numbers the agency used in the Shiplet's farm and home plan for

crop and livestock productivity, family expenses, and oil, gas, and timber receipts,

came from two sources: the Shiplets, or, the state and county averages the agency was

obligated to use when the Shiplets did not provide information.  The Court concludes

that this is not a basis for an intentional discrimination claim, regardless of how other

borrowers were treated.  The Shiplets objectively did not qualify for the loans sought.

See Fritz v. USPS, 36 MFR 408 (November 7, 2008), COL # 8 (plaintiff failed to

state a prima facie case for age discrimination "because he did not establish he was

qualified for the position by satisfactorily performing his job.").

### ii.    The Other Borrowers' Different Situations Account for the Variations in the Numbers Used in Calculations

83.     Again, Shiplet cannot establish that the selected borrowers were

similarly situated in all material respects.  For one thing, FmHA was the primary

lender for all of the principal selected borrowers.  All had a long term relationship

with FmHA, and the agency had invested a significant amount of money to finance

their operations.  (Tr. 205).  As O'Brien acknowledged, the agency had a

responsibility to continue to service existing borrowers, and support their operations,

before taking on new borrowers.  (Tr. 205).  If anything, O'Brien's tables illustrate a

history of the agency's attempts to service the principal selected borrowers' loans

through restructures and subordinations, while providing annual operating credit to

allow them to keep their operations afloat.

84.     That was not true of the Shiplets.  FmHA was never the Shiplet's

primary lender.  In 1995, for example, the Shiplets had $929,579 in farm liabilities,

and only $52,153 of that amount was owed to FmHA.  (Gx. 1, p. 1536c).  They were

also not seeking servicing of existing FmHA loans, and they were not merely

applying for operating credit to finance their annual operation.

85.     In addition, O'Brien's criteria for a similarly situated borrower fails to

appreciate the tremendous diversity of farms and ranches, and farm and ranch

properties, serviced by this FmHA office.   There are four counties serviced by the

office: Gallatin, Park, Meagher, and Sweet Grass.  The government's administrative

Exhibit 5 provides an excellent overview of the size of this area and contrasts within these counties. The counties cover 9,376 square miles. (Gx. 1, p. 13). The soil type, climate, and topography varies tremendously. (Gx. 1, p. 12-13). Each county has it own major river drainages and mountain ranges. Elevations vary in each county by several thousand feet, and range from 3,900 feet in Sweet Grass County, to 12,799 feet in Park County. (Gx. 5, p. 13). The nature and character of certain areas has also been rapidly changing. For example, by 1986 productive farmland in the Bozeman and Belgrade areas of Gallatin County were being purchased and subdivided due to the rapid increase in the Bozeman population. (Gx. 5, p. 13). In short, it simply cannot be assumed that farmers and ranches within this FmHA servicing area were similarly situated for any purpose.

### iii.    The Evidence does not Demonstrate Disparate Treatment

86.    In addition, Shiplet has not established that the principal selected borrowers were given more favorable treatment on their farm and home plans for cash flow purposes. O'Brien's analysis of isolated factors in the farm and home plan does not establish the Shiplets were treated less favorably.

87.    O'Brien's land value analysis, for example, is irrelevant to the Shiplets' situation, since land values were never used as a basis to deny the Shiplets financing.

88.    O'Brien's crop production comparisons are also skewed by the inclusion

of Gallatin County farmers.  The witnesses agreed that Gallatin County has

substantially higher crop yields than Park County, and a disparity in production

values is to be expected.  Further, state and county averages were used for the

Shiplets' plan, and there has been no evidence presented to the agency, to the ALJ, or

to this Court to indicate the Shiplets' actual yields were higher then the projections

used.  In fact, just the opposite is the case.  O'Brien acknowledged that their actual

yields fell well short of the FmHA projections.

89.    The same is true for livestock production.  There are many legitimate

reasons for disparities in livestock production from one producer to another.  As for

the Shiplets, the agency used county and state averages for their livestock projections,

and there has never been any evidence produced at any level that the Shiplets' actual

production records exceeded the values used.

90.    As for family living expenses, the Shiplets themselves provided the

valuation of their family living expenses.  Also, it is difficult to determine how many

people were living on the Shiplet ranch, and how many were included on the

Shiplets' farm and home plans for living expense purposes.  O'Brien based his

opinions on the Shiplets' living expenses on the assumption that there were only 2 to

2.5 people included for living expense purposes.  However, Shiplet has testified, and

has also alleged in her complaint, that there were three families living on the ranch, with a fourth family living there periodically.

91.    Finally, there has been no evidence that the Shiplets had other farm income that was not included in their farm and home plan, which was included for other borrowers.   Shiplet presented no evidence that the Shiplets had any revenue from oil and gas leases, or timber sales during this time period.  There was also no evidence that the Shiplets -  as opposed to their son and his family - had any additional revenue from hunting.  Again, the Shiplets provided the information to FmHA that they were to receive $1,000 per year in 1994 and 1995 for a hunting lease.  Throughout their multiple challenges and appeals relating to the values used on their farm and home plans, the Shiplets never asserted that they had any additional income from hunting or any other source.

92.    The Shiplets also failed to establish that other FmHA borrowers obtained loans, particularly of the magnitude of the loans requested by the Shiplets in 1994 and 1995, when they did not cash flow.  As summarized above, almost all of the loans to the principal selected borrowers were provided in years in which they either cash flowed for purposes of all new loans under a conventional cash flow analysis, or at least cash flowed for purposes of any new operating loan made under the agency's continuation policy.  (FOF # 99-107).

### iv.    The Agency Cannot be Expected to Violate the Law in Order to Extend Credit

93.    Reduced to its essence, a primary thrust of O'Brien's testimony, and Shiplet's case, seems to be that although she was not eligible for the loans she sought, she was discriminated against because other borrowers received loans for which they were not eligible either.  But before the Court can even reach the issue of disparate treatment, Shiplet must prove a prima facie case of discrimination and the Court finds that she has not done so.  The FmHA and its employees were only authorized to provide financing in accordance with the applicable statutes and regulations.  Individual employees did not have the discretion to expand the statutory and regulatory criteria for providing taxpayer funding to individual farmers and ranchers.  Shiplet's case is not advanced by attempting to show that other borrowers received financing to which they were not entitled.  In other words, Shiplet cannot establish that she should have been provided financing unlawfully, by showing that other borrowers obtained loans that were contrary to statute and regulation.

94.    Similarly, Shiplet cannot prevail by asserting that FmHA should have counseled the Shiplets to overstate the values on their farm and home plans.  Even if it could be shown that other borrowers may have inflated their crop and livestock production in order to obtain FmHA financing, that does not lead to the conclusion

that FmHA employees should have advised the Shiplets to also inflate their values to obtain loans through fraudulent means.

           v.       **Shiplet has not Shown that the Similarly Situated Borrowers were not Members of Her Protected Class**

    95.    Finally, the fourth element of a prima facie case under ECOA not only requires that Shiplet establish that similarly situated borrowers were given more favorable treatment, she must also show that they were "not members of the [Shiplet's] protected class."  The evidence indicated that many FSA borrowers in Montana are husband and wife family units, who come to FSA as joint applicants for financing.

    96.    The Shiplets were joint applicants for USDA financing; they were jointly involved in meetings and transactions with FmHA; and they both, without doubt, made significant contributions to their operation.  However, the great majority Shiplet's selected borrowers are also in this same classification.  Levers and the Collins were the only selected borrowers identified without a joint female applicant. The rest, like the Shiplets, were either family units with a husband and wife jointly applying for financing, or a family held corporation with a female principal. Consequently, they are simply not outside the same protected class claimed by

Shiplet.  If anything, their inclusion demonstrates that FmHA did not discriminate against borrowers who applied for financing with a female joint applicant.

### d.   Interest Rate Buy-Down - EE Guaranteed Loan

97.   At the hearing before this Court, O'Brien continued to maintain that an interest rate buy-down was available on the Shiplets guaranteed loan with the bank. (Tr. 828).  To the extent Shiplet continues to maintain on this appeal that she was discriminated against because FmHA did not provide an interest rate buy-down on the Shiplets' guaranteed loan in 1981 and 1984, the Court finds that the program was not available to Shiplets.

98.   The interest rate buy-down program was authorized by Pub. L. 99-198, § 1320, December 23, 1985.  The regulation adopting the program for guaranteed farm ownership, operating, and soil and water loans was first published on February 25, 1986, and the final rule was published, effective immediately, on August 21, 1986.  The pertinent regulation was codified at 7 CFR § 1980, Subpart B, Ex. D (1987).

99.   Simply put, the program was not available at the time of the Shiplets' direct loan applications in 1981 and 1984.  Further, even after the program was implemented, it applied to the three types of guaranteed loans specified, not to the Shiplets' guaranteed  emergency loans.

## IV.   CONCLUSION

Accordingly, it is RECOMMENDED that judgment be entered in favor of the defendant, United States Department of Agriculture, and that Shiplet be denied all relief sought in her Complaint.

**DATED** this 23rd day of December, 2008.


/s/ *Carolyn S. Ostby*
Carolyn S. Ostby
United States Magistrate Judge